

# Department of Veterans Affairs
# Office of Inspector General

# Review of Issues Related to the Loss of VA Information Involving the Identity of Millions of Veterans

Report No.  06-02238-163

**July 11, 2006**

VA Office of Inspector General
Washington, DC  20420

**To Report Suspected Wrongdoing in VA Programs and Operations**
**Call the OIG Hotline – (800) 488-8244**

# Contents

|  | Page |
|---|---|
| **Executive Summary** | i |
| **Introduction** | 1 |
| Purpose | 1 |
| Background | 1 |
| Scope and Methodology | 2 |
| **Results and Conclusions** | 3 |
| Issue 1: Whether the Employee Had an Official Need to Access the Data That Was Stolen, Whether He Was Authorized to Take It Home, and Whether It Was Properly Safeguarded | 3 |
| Issue 2: Whether the Response of Managers and Senior Executives in the Office of Policy, Planning, and Preparedness to the Notification of the Stolen Data Was Appropriate and Timely | 10 |
| Issue 3: Whether the Secretary's Immediate Staff Demonstrated a Lack of Urgency in Notifying the Secretary | 17 |
| Issue 4: Whether Information Security Officials Effectively Triggered Appropriate Notifications and an Investigation of the Stolen Data | 22 |
| Issue 5: Whether VA Policies Safeguard VA Information | 27 |
| Issue 6: Whether Audits and Reviews of VA's Information Management Security Program Controls Continue to Identify Vulnerabilities | 43 |
| **Appendixes** |  |
| A. Secretary's Comments | 52 |
| B. Report Distribution | 68 |

# Executive Summary

## Introduction

On May 3, 2006, the home of a VA employee was burglarized resulting in the theft of a personally-owned laptop computer and an external hard drive, which was reported to contain personal information on approximately 26 million veterans and United States military personnel. The VA Secretary was not informed of the incident until May 16, 2006, almost 2 weeks after the data was stolen. The Congress and veterans were not notified until May 22, 2006.

The Office of Inspector General (OIG) initiated this review to determine: (1) whether the employee had an official need to access the data that was stolen, whether he was authorized to take it home, and whether it was properly safeguarded; (2) whether proper notifications of the stolen data were made, and whether those notifications were pursued in an appropriate and timely manner; (3) whether VA had policies and procedures in place to safeguard personal and proprietary information maintained by VA; and (4) whether VA had sufficiently addressed long-standing OIG reported information security weaknesses. The Senate and House veterans' affairs committees, as well as several other members of Congress, have expressed considerable interest in this review.

The burglary was reported to the local police. When the employee discovered that the computer equipment was among the items stolen, he immediately notified VA management in the Office of Policy, Planning, and Preparedness, including Security and Law Enforcement personnel. The employee advised all of them that the stolen personal computer equipment contained VA data.

## Results

### Employee Not Authorized to Take VA Data Home

Because the employee was responsible for planning and designing analytical projects and supporting surveys involving all aspects of VA policies and programs, he was authorized access to, and use of, VA databases. The employee explained that much of the data that he had stored on the stolen external hard drive was for his "fascination project" that he self-initiated and worked on at home during his own time.

Because of past criticism on the reliability of the National Survey of Veterans, his project focused on identifying approximately 7,000 veterans who participated in the 2001 survey, in order to compare the accuracy of their responses with information VA already had on file. He began the project in 2003, but could not recall spending time working on it during 2006.

To conduct this project, the employee took home vast amounts of VA data and loaded it on an external hard drive. The stolen laptop did not contain VA data. The employee reported that the external hard drive that was stolen likely included large record extracts from the Beneficiary Identification and Records Locator Subsystem (BIRLS) that contained records on approximately 26 million living veterans. The extract contained veterans' social security numbers, full names, birth dates, service numbers, and combined degree of disability. He also reported that the stolen hard drive likely contained an extract of the August 2005 Compensation and Pension (C&P) file, containing personal identifiers of over 2.8 million living veterans.

While the employee had authorization to access and use large VA databases containing veterans' personal identifiers in the performance of his official duties, his supervisors and managers were not aware that he was working on the project, and acknowledged that if they had, they would not have authorized him to take such large amounts of VA data home. In fact, one manager could not justify taking such a large amount of data home under any circumstances.

By storing the files on his personal external hard drive and leaving it unattended, the employee failed to properly safeguard the data and unnecessarily exposed it to risks greater than those existing in the workplace. While the employee stored the laptop and the external hard drive in separate areas of the house, he acknowledged that he took security of the data for granted.

The loss of VA data was possible because the employee used extremely poor judgment when he decided to take personal information pertaining to millions of veterans out of the office and store it in his house, without encrypting or password protecting the data. This serious error in judgment is one for which the employee is personally accountable. The Department has already proposed administrative action.

An Assistant United States Attorney has declined prosecution of the employee for any criminal activity on his part relating to taking VA data to his home. The OIG, in coordination with the Federal Bureau of Investigation (FBI) and the Montgomery County Police Department in Maryland, are continuing to pursue the criminal investigation into the burglary. On June 28, 2006, the stolen laptop computer and external hard drive were recovered intact. Based on all the facts gathered thus far during the investigation, as well as the results of computer forensics examinations, the FBI and OIG are highly confident that the files on the external hard drive were not compromised after the burglary.

**Processing the Notification of the Stolen Data Was Not Appropriate or Timely**

Despite Mr. Michael McLendon, Deputy Assistant Secretary for Policy, being notified of the theft and loss of VA data on May 3, 2006, it was not until May 5, 2006, that the Information Security Officer (ISO) for OPP&P interviewed the employee to determine more facts about the loss. The ISO reported that the employee was so flustered he decided not to discuss the matter; rather he had directed the employee to write down

what data was lost. The employee's written account of the lost data was essentially an identification of database extracts with little quantified information concerning the significance or magnitude of the incident. This is important because this document served as the basis for all further notifications in VA up to, and including, the Deputy Secretary.

Mr. McLendon received the report of the stolen data from the OPP&P ISO on May 5, 2006. Instead of providing the report to higher management, Mr. McLendon advised his supervisor, Mr. Dennis Duffy, Acting Assistant Secretary for Policy, Planning, and Preparedness, of his intent to rewrite the report because it was inadequate and did not appropriately address the event. He submitted his revised report to Mr. Duffy on May 8, 2006.

Our review of Mr. McLendon's revisions determined that his changes were an attempt to mitigate the risk of misuse of the stolen data. He focused on adding information that most of the critical data was stored in files protected by a statistical software program, making it difficult to access. This, however, was not the case because we were able to display and print portions of the formatted data without using the software program. Mr. McLendon made these revisions without consulting the programming expert on his staff or with the employee who reported the stolen data. Mr. Duffy provided the report to Mr. Thomas Bowman, VA Chief of Staff, on May 10, 2006. Mr. Duffy also did not attempt to determine the magnitude of the stolen data nor did he talk to the employee.

Mr. McLendon did not inform his direct supervisor, Mr. Duffy, when he learned of the incident on May 3, 2006. Mr. Duffy advised us that he did not learn of the theft until Friday morning, May 5, 2006, when he spoke with the OPP&P ISO, in what Mr. Duffy described as a rather "casual hallway meeting."

Mr. Duffy did not discuss the matter initially with Mr. McLendon, noting that there had been a long and very strained relationship with him. Mr. Duffy said that Mr. McLendon had a very strong belief that, as a political appointee, he reported in some fashion to the Secretary and that there was no need for a "careerist" to supervise him. Mr. McLendon characterized the office as one of the most dysfunctional organizations in VA, and that it was one of the most hostile work environments he ever worked in.

Mr. Duffy said he just did not perceive this as a crisis. In hindsight, he added that his greatest regret is that he "failed to recognize the magnitude of the whole thing." Both Mr. Duffy and Mr. McLendon bear responsibility for the impact that their strained relationship, which both acknowledged, may have had on the operations of the office in handling the aftermath of the incident.

We also concluded that Mr. John Baffa, Deputy Assistant Secretary for Security and Law Enforcement, who was notified of the incident on May 4, 2006, also failed to take appropriate action to determine the magnitude and significance of the stolen VA data.

Mr. Duffy notified Mr. Bowman of the data theft on May 9, 2006, and followed up with the report the next day. Shortly thereafter, Mr. Bowman provided it to Mr. Jack Thompson, Deputy General Counsel, and asked him to provide an assessment of the agency's duties and responsibilities to notify individuals whose identifying information was compromised. On May 10, 2006, Mr. Bowman informed Mr. Gordon Mansfield, Deputy Secretary, of the burglary and the stolen VA data.

It was not until the morning of May 16, 2006, after the Chief of Staff was informed by the Inspector General that the stolen data most likely contained records with personal identifiers on approximately 26 million records, that Mr. Bowman notified the Secretary of the theft and magnitude of the lost data.

The delay in notifying the Secretary was spent waiting for legal advice from the Office of General Counsel (OGC). This 6-day delay can be attributed to a lack of urgency on the part of those requesting this advice and those responsible for providing the response. This is not to say that everyone who was notified of the incident failed to recognize the importance of this matter, but no one clearly identified it as a high priority item and no one followed up on the status of the request until after the May 16, 2006, call from the Inspector General.

Although Mr. Bowman acknowledged he knew the VA data stolen could affect the records of millions of veterans, he demonstrated no urgency in notifying the Secretary. He notified the Deputy Secretary the day after he learned of the loss. While the Deputy Secretary does not recall discussing the magnitude of the number of veterans affected by the theft, he too decided not to raise the issue to the Secretary until they knew more information on what VA's legal responsibilities were and more about the magnitude of the problem. Once again, no one attempted to contact the employee who reported the theft to determine the magnitude of the lost data. The OIG was able to determine the extent of the stolen data after one interview with the employee on May 15, 2006.

### Information Security Officials Acted with Indifference and Little Sense of Urgency

On May 5, 2006, the OPP&P ISO forwarded information concerning the theft of the data to the District ISO, who is responsible for coordinating ISO activities among VA Central Office staff offices. He also submitted it to the Security Operations Center (SOC), Office of Information and Technology, which has responsibility for assessing and resolving reported information security incidents. However, the OPP&P ISO's incident report had significant errors and omissions, and information security officials did not adequately attempt to identify the magnitude of the incident or elevate it until overtaken by the events on May 16, 2006.

At nearly every step, VA information security officials with responsibility for receiving, assessing, investigating, or notifying higher level officials of the data loss reacted with indifference and little sense of urgency or responsibility. At no time did the District ISO or SOC attempt to interview the employee who reported the data stolen to clarify

omissions in the OPP&P ISO's report or to gain a better understanding of the scope and severity of the potential data loss. While the District ISO elevated the matter to Mr. Johnny Davis, Acting Associate Deputy Assistant Secretary for Cyber Security Operations, this occurred as another "hallway conversation," and he was not provided any details on the nature of the missing data. No further notifications were made up the chain-of-command.

Twelve days after receiving the original incident report, the SOC had made no meaningful progress in assessing the magnitude of the event and, ironically, had passed responsibility to gather information on the incident back to the OPP&P ISO to review it as a possible privacy violation, an area outside the jurisdiction of the SOC. The OPP&P ISO also serves as the Privacy Officer.

**Policies and Procedures Do Not Adequately Protect Personal or Proprietary Data**

The potential disclosure of Privacy Act protected information resulting from the theft of an employee's personal hard drive raised the issue of whether VA policies adequately safeguard information that is not stored on a VA automated system. Based on our review of VA policies that existed at the time of the incident; policies that have been issued since the incident; and interviews with VA employees Chief Information Officers, Privacy Officers, and ISOs; we concluded that VA policies, procedures, and practices do not adequately safeguard personal or proprietary information used by VA employees and contractors.

We found a patchwork of policies that were difficult to locate and fragmented. None of the policies prohibited the removal of protected information from the worksite or storing protected information on a personally-owned computer, and did not provide safeguards for electronic data stored on portable media or a personal computer.

The loss of protected information not stored on a VA automated system highlighted a gap between VA policies implementing information laws and those implementing information security laws. We found that policies implementing information laws focus on identifying what information is to be protected and the conditions for disclosure; whereas, policies implementing information security laws focus on protecting VA automated systems from unauthorized intrusions and viruses. As a result, VA did not have policies in place at the time of the incident to safeguard protected information not stored on a VA automated system.

Although policies implemented by the Secretary since the incident are a positive step, we determined that more needs to be done to ensure protected information is adequately safeguarded. We found that VA's mandated Cyber Security and Privacy Awareness training are not sufficient to ensure that VA and contract employees are familiar with the applicable laws, regulations, and policies. We also found that position sensitivity levels designations for VA and contract employees are either not done or are not accurate. In addition, we found that VA contracts do not contain terms and conditions to adequately safeguard protected information provided to contractors.

We determined that VA needs to enhance its policies for identifying and reporting incidents involving information violations and information security violations to ensure that incidents are promptly and thoroughly investigated; the magnitude of the potential loss is properly evaluated; and that VA management, appropriate law enforcement entities, and individuals and entities potentially affected by the incident are notified in a timely manner.

**Information Security Control Weaknesses Remain Uncorrected**

For the past several years, we have reported vulnerabilities with information technology security controls in our Consolidated Financial Statements audit reports, Federal Information Security Management Act audit reports, and Combined Assessment Program reports. The recurring themes in these reports support the need for a centralized approach to achieve standardization, remediation of identified weaknesses, and a clear chain-of-command and accountability structure for information security. Each year, we continue to identify repeat deficiencies and repeat recommendations that remain unimplemented. These recommendations, among other issues, highlight the need to address security vulnerabilities of unauthorized access and misuse of sensitive data, the accuracy of position sensitivity levels, timeliness of background investigations, and cyber security and privacy awareness training. We have also reported information technology security as a Major Management Challenge for the Department each year for the past 6 years.

## Recommendations

We recommend that the Secretary:

- Take whatever administrative action deemed appropriate concerning the individuals involved in the inappropriate and untimely handling of the notification of stolen VA data involving the personal identifiers of millions of veterans.

- Establish one clear, concise VA policy on safeguarding protected information when stored or not stored in VA automated systems, ensure that the policy is readily accessible to employees, and that employees are held accountable for non-compliance.

- Modify the mandatory Cyber Security and Privacy Awareness training to identify and provide a link to all applicable laws and VA policy.

- Ensure that all position descriptions are evaluated and have proper sensitivity level designations, that there is consistency nationwide for positions that are similar in nature or have similar access to VA protected information and automated systems, and that all required background checks are completed in a timely manner.

- Establish VA-wide policy for contracts for services that requires access to protected information and/or VA automated systems, that ensures contractor personnel are held to the same standards as VA employees, and that information accessed, stored, or processed on non-VA automated systems is safeguarded.

- Establish VA policy and procedures that provide clear, consistent criteria for reporting, investigating, and tracking incidents of loss, theft, or potential disclosure of protected information or unauthorized access to automated systems, including specific timeframes and responsibilities for reporting within the VA chain-of-command and, where appropriate, to OIG and other law enforcement entities, as well as appropriate notification to individuals whose protected information may be compromised.

## Comments

The Secretary agreed with the findings and recommendations and provided acceptable improvement plans.  See Appendix A for the Secretary's response and implementation plans for each recommendation.  For the Secretary's complete response, including the attachments, please refer to the enclosed computer disk.  We will follow up on the implementation of the recommendations until they are completed.

GEORGE J. OPFER
Inspector General

Review of Issues Related to the Loss of VA Information Involving the Identity of Millions of Veterans

# Introduction

## Purpose

The VA Office of Inspector General (OIG) investigated the circumstances surrounding the theft of VA records containing veterans' and other individuals' personal identifiers, which were electronically stored in an employee's personal computer external hard drive maintained at the employee's residence.  The purpose of this investigation was to determine the following:

- Whether the employee had an official need to access the data that was stolen, whether he was authorized to take it home, and whether it was properly safeguarded.

- Whether proper notifications of the stolen data were made, and whether those notifications were pursued in an appropriate and timely manner.

- Whether VA had adequate policies and procedures in place to safeguard personal and proprietary information maintained by VA.

- Whether VA has sufficiently addressed long-standing OIG reported information security weaknesses.

## Background

On Wednesday, May 3, 2006, the home of a VA Information Technology Specialist, hereafter referred to as "the employee," was burglarized resulting in the theft of a personally-owned laptop computer and an external hard drive, which was reported to contain personal information on approximately 26 million veterans and United States military personnel.

The burglary was discovered by the employee's wife on the afternoon of May 3, 2006, who immediately reported it to the local police.  When the employee arrived home on the day of the burglary shortly after 5:00 p.m. and discovered that the computer equipment was among the items stolen, he immediately notified Office of Policy, Planning, and Preparedness (OPP&P) management.  He also notified the VA Office of Security and Law Enforcement, which is part of the OPP&P organization.  The employee advised all of them that the stolen personal computer equipment contained VA data.

The VA Secretary was not informed of the incident until May 16, 2006, almost 2 weeks after the VA data was reported stolen.  The delay in notifying the Secretary resulted in delays in notifying the Congress and veterans.  The public announcement by VA did not occur until May 22, 2006, which was almost 3 weeks after the burglary occurred.

The employee works for OPP&P in VA Central Office (VACO). The employee was responsible for providing data analysis and statistical expertise to support the functions of OPP&P. Among other duties, OPP&P conducts independent analyses for VA decision makers regarding existing policies and programs, including administering a national statistical center to support the continuous enhancement of benefits and services to veterans. Projects can be requested by the employee's supervisors and managers, VA officials outside OPP&P, VA contractors, and entities external to VA, or self-initiated by the employee.

An Assistant United States Attorney has declined prosecution of the employee for any criminal activity on his part relating to taking VA data to his home. The OIG, in coordination with the FBI and the Montgomery County Police Department in Maryland, are continuing to pursue the criminal investigation into the burglary. On June 28, 2006, the stolen laptop computer and external hard drive were recovered intact. Based on all the facts gathered thus far during the investigation, as well as the results of computer forensics examinations, the FBI and OIG are highly confident that the files on the external hard drive were not compromised after the burglary.

## Scope and Methodology

To address the objectives of this review, we interviewed the employee; his supervisors, project managers, and co-workers; privacy, information security, and VA law enforcement officials; VA Austin Automation Center (AAC) officials; Office of General Counsel (OGC) attorneys, including the General Counsel and Deputy General Counsel; the Chief of Staff; the Deputy Secretary; and other Department officials. We reviewed the employee's position description and performance standards; the local jurisdiction's police report of the theft; e-mail, notes, memoranda, and other documentation; chronologies of events prepared by the employee, OPP&P staff, OGC staff, and others; documentation of the employee's access to VA databases; the VA Security Operations Center (SOC) incident report; and other pertinent information. We reviewed cyber security and information security policies published by VA and its organizational components, relevant online training modules, and VA contract documents and contract administration records. We also conducted a forensic analysis of the contents of the compact disks (CDs) and other media the employee had at his home on the day of the burglary, as well as a forensic search of the contents of two other computers at his home.

# Results and Conclusions

## Issue 1:    Whether the Employee Had an Official Need to Access the Data That Was Stolen, Whether He Was Authorized to Take It Home, and Whether It Was Properly Safeguarded

### Findings

The employee reported having VA databases and other files containing veterans' personal identifiers on the external hard drive that was stolen from his home, including large record extracts from the Beneficiary Identification and Records Locator Subsystem (BIRLS) and the Compensation and Pension (C&P) file.  BIRLS is a computer file of information concerning veterans and benefits.  Among other purposes, it is used to determine the location of a veteran's file or to record a veteran's death.  Some of the BIRLS database fields include name, social security number, military service number, claim number, date of birth, date of death, and dates of military service.  BIRLS is not a national security system.  The C&P file consists of records of veterans and beneficiaries receiving VA benefits, and includes database fields such as name, social security number, disability diagnostic codes and ratings, and addresses.

Because the employee was responsible for planning and designing analytical projects and supporting surveys involving all aspects of VA policies and programs, he was authorized access to, and use of, these and other large VA databases.  However, at the time of the burglary he had no official need or permission to take the data home.  In addition, he reported that the data stored on the stolen external hard drive was neither password-protected nor encrypted.  The employee explained that much of the data that he had stored on the stolen external hard drive was for a "fascination project" that he self-initiated and worked on at home during his own time.  It is important to note, however, that this self-initiated project was related to VA and, if the employee was successful in accomplishing his goal, he believed it would be of benefit to VA decision makers.  His supervisors or managers were not aware that he was working on the fascination project, and acknowledged that if they did, they would not have authorized him to take such large amounts of VA data home.

### The Employee Had an Official Need to Use Large VA Databases

According to the employee's current position description, he is responsible for designing and programming information systems and databases "comprised of millions of records" to facilitate analyses used by senior VA officials for policy consideration.  He is responsible for planning and designing analytical projects and studies to improve the management of databases and for supporting ongoing VA surveys.  The employee is expected to plan and execute his assignments independently and to initiate projects and methods of analyzing large databases.  The position description notes, in particular, that the incumbent supports in-house analyses on the data collected through the National Survey of Veterans (NSV).  His performance standards for the 12-month period ending

September 30, 2006, included providing computer specialist expertise to support the administration of the NSV and to support a program of research to continually enhance the veteran survey program.

We confirmed that he used VA data in a multitude of analytical projects requiring access to major VA databases that contain personal information involving millions of veterans, and that access to these databases was requested and granted for official purposes. For example:

- In February 2002, the Veterans Health Administration (VHA) approved giving the employee access to an extract of its National Enrollment Data file, which includes a list of all veterans enrolled to receive VA medical care. The extract includes such identifiers as name, date of birth, address, social security number, and enrollment status and priority. Access was granted for the purpose of supporting national reporting of enrollment data.

- In August 2005, the employee obtained access to the full C&P file, which the AAC provided to OPP&P so it could review issues related to the OIG report, *Review of State Variances in Disability Compensation Payments,* issued May 19, 2005 (Report No. 05-00765-137).

- In October 2005, based on Veterans Benefits Administration (VBA) approval, the AAC gave the employee access to an extract of the BIRLS file. Mr. Dat Tran, Acting Director of the Data Management and Analysis Service in OPP&P and one of the employee's project managers, requested the access, stating that, "We are frequently required to conduct data cross matching across various VA databases and the BIRLS is a key database that we would like to have access to." Mr. Tran also specifically noted in the request for access the employee's data matching efforts to help identify veterans exposed to mustard gas.

We also confirmed that the employee used these and other databases for authorized purposes. Following are some examples:

- In October 2004, using the NSV database provided by the contractor who conducted the survey, the employee responded to a request from VHA for information on the insurance coverage of veterans who received VA inpatient, outpatient, and emergency room care, by priority status.

- In April 2005, as part of an OPP&P ongoing analysis of recipients of the Vocational Rehabilitation and Employment Program, the employee prepared frequency distributions on demographic variables, military service, and disabilities for veterans entitled and not entitled to such program services, and matched the social security numbers of veterans in both groups against the C&P file.

- In August 2005, he prepared a spreadsheet for the Congressional Budget Office showing VA disability compensation by percentage of disability, using the C&P file and the NSV database.

Some of the employee's recently requested and ongoing work that required access and use of large VA databases included:

- An employability research study using the C&P file to compare veterans who had discontinued their involvement in the vocational rehabilitation program with the veterans' degree of disability.

- A project working with the Institute for Defense Analyses (IDA), which was conducting a study of the geographical variations in compensation payments to veterans, to provide IDA an extract with scrambled social security numbers which was based on information in BIRLS. The employee was working on this project shortly before he reported his house had been burglarized.

The employee described to us the projects he had been working on at his home using most of the files he had stored on his stolen external hard drive. One project involved the 2001 NSV. The employee said that the contractor responsible for conducting the survey contacted approximately 7,000 of the 14,000 veterans whose names they sampled from VA files (veterans who were receiving VA benefits or health care) but, rather than providing OPP&P the social security numbers of only those veterans contacted, they provided all 14,000 social security numbers. The employee told us he was attempting to identify the 7,000 veterans actually contacted so he could compare their survey responses with information VA already had on file about them. He said he wanted to determine the extent to which the responses were accurate because OPP&P had received much criticism regarding the reliability of the survey.

The employee told us the survey data included the telephone numbers of all veterans contacted so he was able to begin the identification process by comparing those telephone numbers with numbers in the VA files from which the sample was taken. He said he then used a 2001 online reverse telephone directory to continue identifying other veterans. The employee explained that if he judged a name and address in the reverse telephone directory to match a name and address of one of the 14,000 veterans, he inserted the veteran's social security number into his file.

The employee told us he was personally interested in the process of identifying the approximately 7,000 veterans, referring to the effort as his "fascination project." He said he began the project in 2003, but could not recall spending time working on it during calendar year 2006. According to the employee, he worked on the project at home because it was very time-consuming and he could not devote sufficient time to it at the office. He said he was willing to invest his own time to see if he could make progress in identifying the veterans. The employee told us he never came up with a list of veterans that he considered to be adequately matched.

Ms. Susan Krumhaus, OPP&P Project Manager for the NSV, told us she worked with the employee on the survey until sometime in 2004. She said the two of them wanted to validate survey responses to determine, for example, if veterans experienced memory lapses while taking the survey and what could be done to improve that. However, she said the validation the employee was doing occurred several years ago, and she was not aware that he was working on the project in May 2006.

Mr. Michael McLendon, Deputy Assistant Secretary for Policy and the employee's second-level supervisor, told us the NSV is the largest survey of veterans conducted, and the only source for certain data to characterize the veteran population. He said he assumed the employee was attempting to match survey veterans with veterans in the C&P database or in other records to obtain additional information about them and their cohort group. He noted that VA did not have good integrated data to profile different cohorts of veterans, and that he believed any attempt to give the agency better insight into the veteran population by matching the survey data with information already in VA databases was a legitimate work effort, although he was unaware of the project.

The employee described a second project involving files he had saved on his stolen hard drive. He said he had attempted to identify veterans exposed to mustard gas and other hazardous material, most of whose names, but not social security numbers, were in a Department of Defense (DoD) data file he received from VBA. The employee told us that once a veteran was identified, he provided the veteran's social security number to C&P Service so VBA could begin outreach efforts. According to the employee, the January 2006 extract of the BIRLS file he had taken to his home provided him, for the first time, veterans' service numbers and by matching those numbers with service numbers in the mustard gas file he could then determine, from the BIRLS file, the veterans' social security numbers. Mr. Dat Tran, Acting Director, Data Management and Analysis Service, confirmed that OPP&P was asked to help identify veterans DoD included in its mustard gas file, and that he assigned the project to the employee.

Part of the issue of who knew what concerning the work of the employee was that it was not clear who actually supervised him. For example, in a recent memorandum from Mr. Tran, he makes the point that even though the employee stated that he was his supervisor, he was not. Mr. Tran said they were colleagues and that Mr. Michael Moore performs the supervisory functions of the employee. While Mr. Moore is the employee's first-line supervisor, he admitted that he had no idea what projects the employee was assigned, nor did he have any understanding of the size or contents of the databases with which the employee routinely worked. According to Mr. McLendon, Mr. Moore was given responsibility for first-line supervision of the employee as a result of the reassignment of personnel that occurred because of intense disagreement between Mr. Dennis Duffy, Acting Assistant Secretary for OPP&P, and himself.

## The Employee Had No Official Need to Have the Data at Home

As discussed in Issue 5 of this report, VA regulations require that VA will safeguard an individual against the invasion of personal privacy (38 C.F.R. 1.576). However, we

could not identify any VA policy that specified how protected information not maintained on a VA automated system should be safeguarded, particularly when it is removed from the workplace.

The employee told us he had been taking data containing personal identifiers home since 2003, never asked anyone's permission to do so and, to his knowledge, no one was aware he had it at home. The employee noted, however, that he was issued a VA laptop computer in 2004 and 2005, along with remote access to VA's virtual private network (VPN) and frequently took the laptop, with personal identifiers in it, home, and that his supervisors were aware of it.

According to the employee, when he turned in his VA laptop in January 2006 he continued to take work home and began using a personal laptop and external hard drive, which he had purchased in mid-2005. He used CDs, Digital Versatile Discs (DVDs), floppy disks, and, more recently, a personal flash drive to transport VA data home, where he transferred it to his personal external hard drive. He said he did not believe the information he saved to his external hard drive was at risk because he was careful not to access the Internet with the external hard drive connected to his laptop. He also stored the external hard drive and his laptop in separate parts of his house with the hard drive hidden from view, but acknowledged he took the physical security of the VA data for granted. The employee advised us that he did not store VA data on his personal laptop, but did store unencrypted VA data without password protection on the external hard drive.

Mr. Tran told us the employee never told him he took data with personal identifiers home and he was not aware the employee had done so. On May 17, 2006, Mr. Tran wrote a short statement for VA management noting that the employee's action was self-initiated, and not at the direction of OPP&P management.

Of particular note is the fact that OPP&P managers characterize the employee as a very motivated, hard-working, and dedicated individual who worked long hours and produced meticulous work. The employee was described as a detailed and comprehensive analyst with respect to programming and analyzing data. For his most recent performance appraisal period, the employee was rated "Outstanding," the highest rating in VA's performance appraisal system. He also received a monetary award for his accomplishments in December 2005.

**The Employee Likely Had Large VA Databases on His Stolen External Hard Drive**

According to the employee, he may have had six files containing VA data stored on his stolen external hard drive. He said he had attempted to recall which files may have been on the external hard drive based on what he knew was on a flash drive and some CDs he had at his home, none of which were stolen, and based on what he knew he had been working on at home. The six files were:

- A BIRLS extract, with information as of January 2006, containing approximately 26 million records. According to the employee, 19.6 million of those records contained social security numbers. Additionally, the employee stated that the extract contained information such as the veteran's full name, date of birth, service number(s), and combined degree of disability. The employee stated he was certain he transferred the file from his VA desktop computer to his personal hard drive, but he could not recall if he had deleted it before the burglary.

- An extract of the August 2005 C&P file, containing social security numbers, matched with veterans' full names and dates of birth from BIRLS, and containing records of over 2.8 million living veterans.

- A file containing information obtained from veterans during the 2001 NSV. Data collected included socio-demographic and economic characteristics, military background, health status, VA benefit usage, and anticipated burial plans. According to the employee, this file contained records, all of which included telephone numbers, on over 20,000 veterans. He stated the records included responses received from the survey questions and contained over 6,200 social security numbers.

- A file extracted from both the VHA National Enrollment Data file and the C&P file. The file represented the population from which some veterans were sampled during the NSV (other veterans were selected based on random telephone dialing). According to the employee, the file contained over 5.5 million records, containing the veteran's address, date of birth, claim number, combined degree of disability, enrollment priority, social security number, and telephone number.

- A file the employee created matching veterans' names and addresses contained in the above NSV sample frame with names and addresses contained in a reverse telephone directory look-up file. The employee did not quantify the number of veteran records in this file, but noted that some records may have contained social security numbers.

- A file of over 6,700 service members and civilians who, according to DoD, had been exposed to mustard gas and other substances. According to the employee, many entries contained service numbers but few included social security numbers. He stated that information on a veteran may have included name; date of birth; exposure type, site, and date; service connected percentage; and diagnostic codes.

We determined that the above files, numbers of records, and identifying information were on the CDs, flash drive, and other media the employee had at his home at the time of the burglary, and thus could have been on his stolen hard drive. Subsequently, it was determined that as many as 2.2 million U.S. military personnel could have been in

the BIRLS data that was stolen, including 1.1 million active duty personnel, 430,000 National Guard members, and 645,000 reserve members.

The employee noted, and we confirmed, that he had a file on his flash drive containing data extracted from the VHA patient treatment file regarding a single veteran who visited VA health care facilities on 57 different dates. The file of the deceased veteran contained a partial social security number and diagnostic codes describing each visit. The employee said he did not believe this file was transferred to his hard drive because he used it only to debug a program to summarize such information and said the file was of no further use to him. Regarding another file found on one of the employee's CDs, he told us it pertained to a project he was working on using vocational rehabilitation data and said he did not believe it was on his stolen hard drive because he had no interest in working on that project at home.

## Conclusion

While the employee had authorization to access and use large VA databases containing veterans' personal identifiers in the performance of his official duties, he had no need or authorization to take the data home. However, by storing the files on his personal external hard drive and leaving it unattended, the employee failed to properly safeguard the data and unnecessarily exposed it to risks greater than those existing in the workplace. While much has been made about the burglary of the employee's home and theft of the external hard drive, the loss of VA data was possible because the employee used extremely poor judgment when he decided to take personal information pertaining to millions of veterans out of the office and store it in his house without password protecting and encrypting the data. The employee is personally accountable for this serious error in judgment. The Department has already proposed administrative action.

## Issue 2:  Whether the Response of Managers and Senior Executives in OPP&P to the Notification of the Stolen Data Was Appropriate and Timely

## Findings

Although senior managers and other staff in OPP&P were informed of the possible loss of VA data on May 3, 2006, the date of the burglary at the employee's home, the incident was not communicated up the chain-of-command until the VA Chief of Staff was notified 6 days later on May 9, 2006.  This delay occurred in large part because senior executives in OPP&P failed to take appropriate and timely action to determine the extent and scope of the stolen data.  Furthermore, VA Security and Law Enforcement officials focused on whether VA "equipment" had been stolen and not on the fact that the theft included VA information.  Finally, OPP&P executives erroneously assumed that the SOC was sufficiently addressing the reported data loss and would make appropriate notifications.

### OPP&P Officials Waited 6 Days before Notifying the Office of the Secretary and Failed to Determine the Magnitude of the Data Loss

Upon discovering the theft of his personally-owned laptop computer and external hard drive on May 3, 2006, the employee telephoned his office around 5:00 p.m. to report the burglary and data theft.  During the next couple of hours, the employee talked to Mr. McLendon, Mr. Tran, and Mr. Kevin Doyle, Security and Law Enforcement Police Operations Team Leader.  The employee told us that he advised each of them about the burglary and possible theft of VA data.

Shortly after 5:00 p.m., the first person the employee talked to was Mr. Doyle. Mr. Doyle's recollection of the call was that the employee only told him that he had a burglary at his home and that he had personal property missing.  Mr. Doyle told us he did not remember being told anything about VA data.  He added that the caller was very upset and noted that this could be "a career-ending incident," but did not get the employee's name because he was on a Metro train when he took the call.  Mr. Doyle recalls telling the caller that since the incident did not occur at VA and no VA property was taken, the caller needed to coordinate through his local police department. Mr. Doyle said he did not query the individual further for details, and the call only lasted a couple of minutes.  Mr. Doyle told us that because he was on annual leave the next day, he telephoned Mr. John Baffa, Deputy Assistant Secretary for Security and Law Enforcement, to ask if anyone reported a burglary or a missing computer.

The employee's recollection of this call was that he did tell Mr. Doyle that the stolen computer equipment had VA data on it.  When questioned further about what he told Mr. Doyle, the employee said, "I wouldn't just report the theft of my private property to him."  Also, when we interviewed Mr. Baffa, he testified that Mr. Doyle told him the next day that the employee told him that there might have been some VA material on the stolen computer equipment.

About 5:30 p.m., the employee then talked to Mr. McLendon. Mr. McLendon stated that the employee was very upset about the incident and that the local police were still at the employee's residence. According to Mr. McLendon, he did not discuss the specific type or amount of data possibly located on the stolen external hard drive with the employee because, "There was no way to have a detailed dialogue at that time about what data was missing." Mr. McLendon told the employee to take the next day off to deal with the burglary, and never personally followed up with the employee again.

Around 6:45 p.m., Mr. Tran telephoned the employee to obtain a better sense about the data theft. The employee advised Mr. Tran that he believed that the stolen external hard drive potentially had a copy of a BIRLS extract that he had downloaded from the AAC. Mr. Tran did not attempt to obtain any further information at that time, nor did he have a follow-up conversation with the employee until May 8, 2005.

On Thursday, May 4, 2006, Mr. Tran advised Mr. McLendon and the OPP&P Information Security Officer (ISO) that the employee believed that a copy of a BIRLS extract was probably on the external hard drive that was stolen. At the direction of Mr. McLendon, Mr. Tran met with the ISO, who also serves as the Privacy Officer (PO) for OPP&P, to identify what action was required. No further significant action was taken that day since the employee was at home, and no notifications were made to senior VA management officials.

Despite being notified of the loss of VA data on May 3, 2006, Mr. McLendon did not inform his direct supervisor, Mr. Duffy. Mr. Duffy advised us that he did not learn of the theft until Friday morning, May 5, 2006, around 9:45 a.m., when he spoke with the OPP&P ISO, in what Mr. Duffy described as a rather "casual hallway meeting." The ISO advised Mr. Duffy of the circumstances surrounding the burglary and theft of protected veteran data, and indicated that he was working with Mr. McLendon and Mr. Tran on the matter.

When we asked Mr. Duffy if he discussed the matter with Mr. McLendon on May 5, 2006, he said no, noting that there had been a long and very strained relationship with him. Mr. Duffy said that Mr. McLendon had a very strong belief that, as a political appointee, he reported in some fashion to the Secretary and that there was no need for a careerist to supervise him. Mr. McLendon characterized the OPP&P as one of the most dysfunctional organizations in VA, and that it was one of the most hostile work environments "he ever set foot in."

During the hallway conversation with Mr. Duffy, the OPP&P ISO also stated that he had notified the SOC as part of his ISO duties and responsibilities. Mr. Duffy recalled directing the ISO to provide him with as comprehensive a list as he could of the data sets and the specific personal identifier data elements that were believed to have been stolen and the magnitude. We determined that Mr. Duffy later briefed the VA Chief of Staff on the stolen data without following up to determine if a comprehensive list was developed or if the magnitude of the loss was determined.

When asked why no one in OPP&P attempted to quantify the loss until directed to do so on May 16, 2006, by OGC, Mr. Tran stated that they followed the prescribed procedure issued by Cyber Security or the SOC, that basically says when you have an incident you report it your ISO, and then your ISO will follow the prescribed process. Mr. Tran's assertions that he was unfamiliar with the size of the BIRLS extract are undermined by an e-mail sent to him by the employee on April 6, 2006, approximately a month before the burglary, in which the employee noted that he downloaded the April 2006 BIRLS extract and that the file contained 26,503,436 records.

Mr. Duffy asked the OPP&P ISO to advise him what the procedures and obligations were with respect to notification, since he was both the ISO and PO. Both Mr. Duffy and Mr. McLendon admitted that they had no knowledge of what the SOC would do with the information, but assumed erroneously that the SOC would make appropriate notifications. In fact, Mr. Duffy said he did not even know that there was a SOC before the burglary.

Mr. McLendon recalled thinking he fully expected the next day to see a "wave of IG people," or people calling from upstairs saying "come up here and give us a simple version of this and what you think our potential exposure may be, but nobody ever called." Instead, he noted, "We waited. The process has been notified. The process will tell us what we're supposed to do here."

Mr. Duffy and Mr. McLendon said that they relied almost exclusively on OPP&P's GS-13 ISO/PO to investigate and report his findings to the SOC, thereby absolving them of any responsibility for insuring that law enforcement had all of the information about what was actually stolen. Ironically, when questioned about his role as an ISO for the SOC, the OPP&P ISO said "I'm not an investigator. I'm a computer tech guy that has a job."

The OPP&P ISO interviewed the employee on Friday, May 5, 2006. He advised us that because the employee was so flustered and because he knew the employee was going to be interviewed by a "bunch of people," he did not want to become part of it.

The OPP&P ISO told us that within 3 or 4 minutes into the conversation the employee was going in so many different directions he could not take good notes, so he told the employee to write it down and send it to him. Based on the employee's report, which was received around 2:00 p.m., the ISO drafted a "White Paper on Lost Data" that he e-mailed to Mr. Duffy and Mr. McLendon around 3:30 p.m. Shortly after that, Mr. McLendon responded to Mr. Duffy and the ISO indicating that he would review the document over the weekend. No further action on this matter appears to have occurred during the next 2 days (weekend), including any notifications to senior VA management officials.

On Monday morning, May 8, 2006, Mr. McLendon advised Mr. Duffy that, in his view, the OPP&P ISO's white paper was inadequate and did not appropriately address the event. Mr. McLendon stated he would re-draft the ISO's white paper. In preparation for

finalizing the revised white paper, Mr. McLendon stated that Mr. Tran would query the employee about the data that was on the hard drive and disks, citing a need to "be as precise as possible and not leave huge gaps where people will jump to conclusions." Mr. McLendon stated that the section describing what may have been lost would be updated, and that Mr. Tran "accelerated his discussions with the employee."

Mr. McLendon's assertion that Mr. Tran continued to query the employee about the data that was on the hard drive and disks is disputed by Mr. Tran, who advised us that his sole purpose in contacting the employee on May 8, 2006, was to determine if CDs and the flash drive were actually stolen during the burglary, not what was on them. Mr. Tran stated that prior to May 16. 2006, he never attempted to quantify the number of records in any of the databases believed to have been stolen in any of his conversations with the employee, and he was not asked to.

Later that day, Mr. McLendon forwarded the revised white paper to Mr. Duffy, Mr. Tran, and the OPP&P ISO. Mr. McLendon, who titled his memorandum "Possibly Lost Veterans Data," noted that he had added further detail for clarity. Our review of the two papers indicated that Mr. McLendon's changes to the white paper focused on providing more background information on the burglary and who was notified, and information concerning the fact that most of the critical data was stored in files formatted in Statistical Analysis System (SAS).

This revised white paper which was completed on May 8, 2006, and put in memorandum format, inaccurately retained the May 5, 2006, date and the OPP&P ISO's name and title. Also, while the memorandum did provide additional clarification on some aspects, it did not address the magnitude or extent of the stolen data in terms of numbers of veterans. Even though the ISO's May 5, 2006, white paper indicated that one of the files believed to be stolen contained "BIRLS' First, Last, and Middle Names for each veteran in the C&P Mini-Master, using SSN as the matching criteria," there is no testimonial or documentary evidence that Mr. McLendon either personally or via a subordinate attempted to quantify the number of records in the stolen BIRLS or C&P files until OGC requested further review on May 16, 2006.

In what we conclude was an effort to mitigate the loss of data, Mr. McLendon's primary contribution to the editing of the OPP&P ISO's white paper was the assertion that SAS formatting protected most of the stolen data from all but SAS programmers with access to an expensive copy of the SAS application. This is not the case because we were able to display and print a portion of the SAS formatted data without the SAS program. Finally, Mr. McLendon, who is not an expert in SAS, failed to consult with the OPP&P SAS expert before revising and forwarding the white paper to upper management; implying that the SAS formatting afforded protection for most of the stolen data.

Late in the afternoon on Tuesday, May 9, 2006, Mr. Duffy met with Mr. Thomas Bowman, VA Chief of Staff, to discuss a number of issues, including the burglary that Mr. Duffy said he characterized to Mr. Bowman as a "fairly serious breach of sensitive data." Mr. Duffy suggested to Mr. Bowman that it was important for the VA senior

leadership to meet and assess VA's affirmative obligation to notify the beneficiary population whose data may have been compromised.

On Wednesday morning, May 10, 2006, Mr. Duffy again briefed Mr. Bowman and provided him with a copy of the May 5, 2006, memorandum. Mr. Duffy recalled that he defined terms and acronyms contained in this memorandum, such as SAS, NSV, and BIRLS, for Mr. Bowman. Mr. Duffy stated that Mr. Bowman made a number of notations on the memorandum. Although Mr. Duffy recalled explaining that the BIRLS system is used by VBA, in particular, to identify veterans and match up names, social security numbers, and claim numbers, he could not recall providing Mr. Bowman with an estimate of the number of records lost in the burglary.

Mr. Duffy stated that it was his intention to reveal the loss of data to the Deputy Secretary, but decided to inform Mr. Bowman on May 9, 2006, when the weekly Tuesday meeting convened by the Deputy Secretary was cancelled. When asked why he did not notify the Chief of Staff or the Deputy Secretary when the OPP&P ISO's original "White Paper" was completed on May 5, 2006, Mr. Duffy admitted that there was no real sense of urgency on his part. He perceived the problem to be limited to the 20,000 or so veterans in the NSV and the approximately 6,000 veterans in the mustard gas file. He acknowledged knowing there were personal identifiers in the stolen information and that VA had an obligation and a responsibility to mitigate it. However, he added that he knows how VA operates— "they do not do crisis management." Mr. Duffy said he did not perceive this as a crisis. In hindsight, he added that his greatest regret is that he "failed to recognize the magnitude of the whole thing."

Mr. Duffy advised us that he was not contacted about the incident after his May 10, 2006, meeting with Mr. Bowman until May 17, 2006, when he was invited to participate in a pre-brief for the congressional hearing and was handed a copy of a May 17, 2006, memorandum written by Mr. McLendon. This was the first time Mr. Duffy saw that more than 26 million records were involved and included social security numbers and other information. Mr. McLendon's May 17, 2006, memorandum was written in response to a request from the VA General Counsel on May 16, 2006, asking that specific information about the loss be determined and documented by OPP&P. Mr. Duffy was not aware of the request from OGC or Mr. McLendon's response after it was submitted to OGC.

**The Deputy Assistant Secretary for Security and Law Enforcement Did Not Make the Appropriate Inquiries to Notify Appropriate Law Enforcement Entities of the Potential Impact on VA Programs and Operations**

VA regulations require all VA employees to immediately report information about actual or possible violations of criminal laws related to VA programs, operations, facilities, contracts, or information technology systems to their supervisor, any management official, or directly to the OIG (38 C.F.R. 1.201). Information about actual or suspected violations of criminal laws related to VA programs, operations, facilities, or involving VA employees, where the violation of criminal law occurs on VA premises will be reported by VA management officials to the VA police (38 C.F.R. 1.203).

Our investigation found that the employee complied with the provisions of §§1.201 and 1.203 when he reported the theft of his personal computer and external hard drive to his supervisors and VA law enforcement. We concluded that Mr. John Baffa, Deputy Assistant Secretary for Security and Law Enforcement, failed to take appropriate action to determine if there was an actual or possible crime involving VA programs and operations. If he had made the proper inquiries, he would have known that the theft was a possible violation of criminal laws relating to VA programs that was required under §1.203 to be reported to the appropriate Federal law enforcement entity for investigation, including the VA Inspector General. An inquiry also would have determined that the theft of the data was a potential felony involving VA programs that was required to be reported to the OIG under the provisions of 38 CFR §1.205.

Mr. Baffa told us that late morning on May 4, 2006, Mr. Doyle called him and asked if he heard anything regarding a burglary or theft of a computer. Mr. Doyle advised Mr. Baffa that an employee had called him the day before and was "concerned because his house had been broken into and his personal computer stolen" and, when the employee was asked why he was calling the Office of Security and Law Enforcement, "he said that there might have been some VA material on it."

Based on his conversation with Mr. Doyle, Mr. Baffa was aware that the stolen data may have contained VA material. While he may not have had sufficient information at the time to comprehend the significance of the incident, he did not take appropriate action to determine if there was a crime involving VA programs, operations, or employees. He did not make any inquiries to determine what "VA materials" may have been stolen; whether the "VA materials" included information protected by the Privacy Act, a VA confidentiality statute, or the Health Insurance Portability and Accountability Act (HIPAA); whether the employee had violated Federal law by inappropriately accessing the information; whether the employee had violated the Privacy Act or other statute by disclosing protected information, etc. Had he made these inquiries, he should have recognized the significance of the matter and contacted the Department of Justice (DOJ), the OIG, or other appropriate law enforcement entity to ensure that they were aware of the magnitude of the data on the stolen and the potential impact on VA.

In his interview, Mr. Baffa implied that he may have acted differently if he had been informed that the employee had told Mr. Doyle that the theft "could be a career-ending incident for him." We do not believe this exonerates Mr. Baffa from his obligation to determine if there was a crime or possible crime that potentially involved VA because Mr. Baffa knew the most important fact— that VA material may have been stolen.

Mr. Baffa's decision not to take any further action because the OPP&P ISO was working on the issue also does not relieve him of his duty to exercise due diligence to determine if a crime occurred involving VA programs and report to the appropriate law enforcement entity. Mr. Baffa also told us that later in the day on May 4, 2006, he

looked in the VA directory and determined that the employee worked in OPP&P. He then went there to inquire whether someone reported the theft of a computer. He said he met with the ISO, who told him that he was working on it. Mr. Baffa said that he took no further action because he felt it was the ISO's responsibility as the ISO to investigate the matter, which he understood to be a computer security issue. He added that if nothing had been physically stolen from VA and the SOC is notified, then once they do what they have to do they would then notify him that he had a problem.

There is nothing in the law or policy that provides the ISO jurisdiction to investigate potential criminal activity. As discussed in Issue 5, the relevant VA policies, VA Directive and Handbook 6210 and VA Handbook 6502.1, do not require the ISO or PO to conduct a criminal investigation and do not require any reporting to law enforcement. In addition, there is no VA policy that requires the Office of Security and Law Enforcement to wait until the ISO or PO conducts an investigation. The Office of Security and Law Enforcement has responsibility for ensuring that crimes or potential crimes involving VA property, programs, and operations are investigated.

## Conclusion

While no policy was violated in the handling of the incident, staff and senior managers who were notified of the theft failed to take appropriate action to determine the magnitude of what was stored on the stolen external hard drive, or whether it was encrypted or otherwise protected. The failure to determine this resulted in not recognizing the potential significance on VA programs, operations, and veterans. Since the local police were not told for 13 days that VA data was stolen during the burglary, valuable forensic evidence was most likely lost. The delay also prevented the burglary from receiving the urgency it warranted from Federal law enforcement agencies.

Poor communication, partially resulting from a dysfunctional working relationship among senior OPP&P executives, contributed to the 6-day delay in notifying the Office of the Secretary. While there was considerable rhetoric among OPP&P management concerning the need to identify the extent and scope of the stolen data, there was virtually no follow-up to obtain results. Also, the lack of urgency in addressing this issue was impacted by the false assumption that the SOC had the responsibility to investigate the incident and make all required notifications. This led to the situation where the magnitude of the problem was still undetermined when brought to the attention of the VA Chief of Staff 6 days after the burglary. Both Mr. Duffy and Mr. McLendon bear responsibility for the impact that their strained relationship, which both acknowledged, may have had on the operations of OPP&P in handling the aftermath when it occurred.

## Recommendation

Based on the circumstances presented in this section, we recommend that the Secretary take whatever administrative action he deems appropriate concerning the individuals involved.

## Issue 3:  Whether the Secretary's Immediate Staff Demonstrated a Lack of Urgency in Notifying the Secretary

## Findings

On Tuesday, May 9, 2006, Mr. Duffy notified Mr. Bowman of the data theft. Mr. Bowman asked Mr. Duffy to provide him additional details regarding what data may have been breached, and the following morning, Wednesday, May 10, 2006, Mr. Duffy gave Mr. Bowman the "May 5th memorandum," as discussed in Issue 2.  At approximately 1:30 p.m. on May 10, 2006, Mr. Bowman provided a copy of this memorandum to Mr. Jack Thompson, Deputy General Counsel, and asked him to provide an assessment of the agency's duties and responsibilities to notify individuals whose identifying information was compromised.  Also on the afternoon of May 10, 2006, Mr. Bowman informed Mr. Gordon Mansfield, Deputy Secretary, of the burglary and the stolen VA data.

It was not until the morning of May 16, 2006, after the Chief of Staff was informed by the Inspector General that the stolen data most likely contained records with personal identifiers on approximately 26 million records, that Mr. Bowman notified the Secretary of the theft and magnitude of the lost data.  Six days of the 7-day delay in notifying the Secretary was spent waiting for legal advice from OGC on VA's legal responsibility to notify individuals potentially impacted by the loss of the data.  This 6-day delay can be attributed to a lack of urgency on the part of those requesting this opinion and those responsible for providing the response.  This is not to say that everyone who was notified of the incident failed to recognize the importance of this matter, but no one clearly identified this as a high priority item and no one followed up on the status of the request until after the May 16, 2006, call from the Inspector General.

### VA Chief of Staff and Deputy Secretary Waited 7 Days Before Notifying the Secretary of the Data Loss

Mr. Bowman told us that Mr. Duffy first informed him of the burglary and loss of data containing personal identifiers on Tuesday, May 9, 2006.  He said they had been having some "light conversation" when Mr. Duffy said, "I may as well bring to your attention the fact of this loss of information."  Mr. Bowman said he asked Mr. Duffy to provide him written details regarding what data may have been stolen from the employee's home because he wanted to provide those details to OGC and obtain advice as to what VA must do with respect to notifying veterans about the loss.

According to Mr. Duffy and Mr. Bowman, the two met again the next morning, May 10, 2006, and Mr. Duffy provided Mr. Bowman a copy of the May 5, 2006, memorandum. Mr. Bowman told us that when they discussed the memorandum, he wrote notes on his copy as Mr. Duffy talked.  One notation was "20k records."  Mr. Bowman told us he thought that note referred to the size of the 2001 NSV database and several witnesses confirmed that approximately 20,000 veterans were surveyed.  Mr. Bowman's note, however, was placed on the memorandum next to the description of BIRLS and not

near the description of the NSV. Nevertheless, according to Mr. Bowman, Mr. Duffy said the loss "could be as little as 20-some thousand or it could be millions."
Mr. Bowman said he questioned Mr. Duffy if he was referring to BIRLS when he said the loss could be millions, and said Mr. Duffy responded, "It could go that high if that's in fact what was lost." He said he recalled Mr. Duffy using the figure "up to 24 million," to explain the magnitude of records contained in BIRLS.

Mr. Bowman informed us that on May 10, 2006, he took a copy of the May 5, 2006, memorandum to Mr. Thompson and asked for advice on what the VA's notification requirements were as a result of the loss of sensitive data. He told us he did not recall giving Mr. Thompson a deadline to provide a response, nor did he remember whether he conveyed a sense of urgency regarding the need for a quick response.

Mr. Bowman stated he also informed Deputy Secretary Mansfield on May 10, 2006, and provided him a copy of the May 5, 2006, memorandum with his "20k records" notation. According to Mr. Bowman, he told Mr. Mansfield that the loss could be "as small as 20,000 and it could be in the millions— the BIRLS system." Again, he told us, "I remember specifically telling the Deputy…we don't have any feel for whether it is as little as 20,000 or in the millions." Mr. Bowman said he told the Deputy Secretary that he requested legal advice from OGC, and that the Deputy Secretary asked to be kept informed.

Mr. Mansfield confirmed that Mr. Bowman told him about the loss of data on May 10, 2006. He said Mr. Bowman gave him a copy of the May 5, 2006, memorandum containing Mr. Bowman's handwritten notes, including the notation "20k records."
Mr. Mansfield told us it was his understanding that the 20,000 records represented an extract of BIRLS and that OPP&P was attempting to determine which subsets of that database were involved. He said he asked Mr. Bowman to find out more information regarding how many and which files were stolen. He told us that based on the briefing he received from Mr. Bowman, he believed potentially 20,000 records were involved.

Because the Deputy Secretary's recollection of the conversation differed from
Mr. Bowman's concerning the issue of the magnitude of the loss we had a follow-up conversation with Mr. Bowman, who stated that it is possible that he advised the Deputy Secretary that BIRLS may have been lost, assuming that the Deputy Secretary would have recognized that BIRLS contained millions of records.

Mr. Mansfield told us that he and Mr. Bowman did not discuss notifying the Secretary. He said they were trying to get more information about the loss in order to be able to give the Secretary more details and to identify what needed to be done as far as notifying what he believed at the time was approximately 20,000 veterans. He said had he known the loss affected 26 million veterans he might have notified the Secretary immediately, but thinking the loss was around 20,000 records he wanted to get more information on exactly what happened.

Mr. Mansfield told us that, although he and the Secretary converse on a daily basis, he did not notify the Secretary about the data loss immediately after he first learned of it. Mr. Mansfield said that he had commented during the meeting with Mr. Bowman on the need to find out exactly what the size of the lost data was and to check with OGC on what else they needed to do to brief the Secretary. After the meeting, the Deputy Secretary left work on a personal matter and was out of the office either on personal business or speaking engagements from the afternoon of May 11-16, 2006.

Mr. Bowman took no further action on this matter until he received a telephone call from the Inspector General (IG) at approximately 8:30 a.m. on Tuesday, May 16, 2006. During the call, Mr. Bowman was informed that OIG staff learned through an interview with the employee that personally-identifiable data, including names, dates of birth, and social security numbers for as many as 24–26 million veterans may have been taken during the burglary. Mr. Bowman acknowledged to the OIG officials that he was aware of the incident, but did not know the magnitude of the loss. Mr. Bowman acknowledged that he thought the incident involved "hundreds of thousands" of records. The IG informed Mr. Bowman that the Secretary needed to be briefed on this issue.

Shortly after the telephone call from the IG on May 16, 2006, but before he received the memorandum from OGC, Mr. Bowman met with the Secretary to inform him of the theft and loss of data. He told us he informed the Secretary that he had informed the Deputy Secretary of the incident and that the scope of the loss, according to the OIG, was 24–26 million records. According to Mr. Bowman, after he advised the Secretary of the possible loss, Mr. McClain provided him the memorandum he requested at approximately 11:00 a.m. that morning. The memorandum was dated May 16, 2006.

Mr. Bowman told us he did not notify the Secretary sooner because he was waiting for the OGC memorandum. He said he wanted "substance and at least some organizational understanding" of what he needed to report, as he did not want to alert the Secretary "to something that is dramatic unless there is a basis for it," and if the facts showed that the matter was not urgent he did not want to "take up time with something that…can maybe be put in a memo that he can look at leisurely." While acknowledging that he enjoyed an "open door" relationship with the Secretary, Mr. Bowman decided he wanted to first work with the Deputy Secretary and other senior leadership, using the anticipated advice from OGC, to develop a strategy for responding and a set of recommendations. However, Mr. Bowman said that, after receiving the telephone call from the Inspector General, he felt he needed to tell the Secretary without waiting any longer for the OGC memorandum. He told us, in retrospect, he realized he should have given the Secretary the same notice he gave the Deputy Secretary on May 10, 2006.

## A Lack of Follow-Up and Editorial Changes Delayed OGC Legal Advice to the Chief of Staff for Several Days

At approximately 1:30 p.m. on Wednesday, May 10, 2006, Mr. Bowman met with Mr. Thompson and provided him a copy of the May 5, 2006, memorandum. According

to Mr. Thompson, Mr. Bowman asked him what VA's legal obligations were to the individuals whose identities may have been compromised as a result of the theft. While Mr. Thompson acknowledged he knew the issue was significant because it was unusual for the Chief of Staff to personally request an opinion, he told us Mr. Bowman neither told him about the magnitude of the loss nor gave him a deadline for responding. Regarding a deadline, Mr. Thompson noted that Mr. Bowman had come to his office about an hour earlier on another matter and gave him a 30-minute deadline to respond.

Mr. Thompson put a routing slip on the memorandum Mr. Bowman provided and wrote on it, "The Chief of Staff asks, 'What is VA's responsibility in terms of notifying the individuals whose identities may become known as a result of this theft?' " He addressed the routing slip to OGC Professional Staff Group 4 (PSG 4), which handles information law issues, but did not establish a deadline for the response. He said he believed it was "self evident that this was a priority matter" because the Chief of Staff had handed the memorandum to him and he had it hand-carried to the individuals responsible for addressing the issue.

According to Mr. Thompson, an administrative assistant delivered the memorandum to PSG 4, where another administrative assistant told us she recalled leaving the package on the chair of Mr. Jeff Corzatt; an attorney in PSG 4. Mr. Corzatt told us he found the folder in his chair on May 10, 2006. He said he wrote a response to the question written on the routing slip that afternoon, thought overnight about what he had written, and made some changes the next day, May 11, 2006. He said he then gave the response to his supervisor, the PSG 4 Deputy Assistant General Counsel, that afternoon. Mr. Corzatt told us he considered the response final on May 11, 2006, less than 24 hours after he was assigned to write it. He told us he was not at work on Friday, May 12, 2006.

The PSG 4 case tracking system documents that the response was approved by its management on Friday morning, May 12, 2006, and hand-carried to the General Counsel's office for review and approval. An administrative assistant in the General Counsel's office told us she received it that morning, and while proofreading it she noticed a need for minor edits. She marked them and personally hand-carried the folder on Friday afternoon to an administrative assistant in PSG 4 to have the edits made. The case tracking system indicates the edits were made on Monday, May 15, 2006, and returned that afternoon.

Mr. Thompson told us he did not discuss the Chief of Staff request with the attorney who prepared the memorandum, nor did he follow up on it. Mr. McClain said he was not aware of the request for legal advice by Mr. Bowman prior to May 16, 2006, and that Mr. Thompson had not talked to him about either the loss of data or the request. Mr. McClain said he first saw the memorandum in his in-box in the early morning of May 16, 2006, and reviewed it and signed it. Mr. McClain said that the call from the IG came shortly after that. He then went back to his office and retrieved the memorandum, made copies, and took it to the 11:00 a.m. meeting with the Chief of Staff and others.

The May 5, 2006, memorandum that Mr. Bowman gave Mr. Thompson expressly stated that the information possibly stolen contained "a copy of the BIRLS production file in SAS format which contained SSN, DOB and NAME for living and deceased veterans." In addition, the memorandum also mentioned that a CD "contained BIRLS' First, Last, and Middle Names for each veteran in the C&P Mini-Master." Prior to becoming Deputy General Counsel, Mr. Thompson spent many years in OGC as the Assistant General Counsel for PSG 2, which provides legal advice and assistance to VBA. As an attorney for VBA, Mr. Thompson should have had knowledge about major VBA databases such as BIRLS and the C&P file. While he may not have been familiar with the full extent of details in these databases, he should have known that the records of millions of veterans were contained in them and, therefore, were potentially compromised.

The OGC attorneys involved in addressing Mr. Bowman's request limited their response to the specific question he asked: "What was the duty of VA to notify the individuals whose personal data may have been lost or compromised?" Between May 10 and May 16, they took no affirmative action to assist or advise VA of any other issue related to the incident until after the IG provided information on the magnitude of the loss.

## Conclusion

Although Mr. Bowman acknowledged he knew the VA data stolen on May 3, 2006, could affect the records of millions of veterans, he demonstrated no urgency in notifying the Secretary of the incident. He notified Mr. Mansfield the day after he learned of the loss, but Mr. Mansfield too decided not to raise the issue to the Secretary until they knew more information on what VA's legal responsibilities were and more about the magnitude of the problem. Mr. Mansfield recalled instructing Mr. Bowman to focus on identifying these issues; however, Mr. Bowman does not recollect being asked to obtain any additional information other than the legal advice from OGC. Yet, during the 6 days following his request for legal advice from OGC, Mr. Bowman did not follow up to determine its status of the request, or task anyone to develop a more definitive description of how many veterans' records may have been stored on the stolen external hard drive. While Mr. Bowman states that he was aware that it could have been millions, no effort was made to clearly identify what was in the stolen files. The OIG was able to determine the extent of the stolen data after one interview with the employee on May 15, 2006. It is unexplainable as to why the employee, who reported the stolen data, was never consulted by anyone in the management chain-of-command except the GS-13 ISO/PO for OPP&P, until May 16, 2006.

### Recommendation

Based on the circumstances presented in this section, we recommend that the Secretary take whatever administrative action he deems appropriate concerning the individuals involved.

## Issue 4:  Whether Information Security Officials Effectively Triggered Appropriate Notifications and an Investigation of the Stolen Data

## Findings

As soon as the employee returned to duty on May 5, 2006, the OPP&P ISO obtained from him information concerning the theft of the data and forwarded it to the SOC, an organizational component of the Office of Cyber and Information Security, and to the District ISO, who is responsible for coordinating ISO activities among VACO staff offices.  However, the OPP&P ISO's incident report had significant errors and omissions, and information security officials did not adequately attempt to identify the magnitude of the incident or elevate it until their role was overtaken by events on May 16, 2006.

At nearly every step, VA information security officials with responsibility for receiving, assessing, investigating, or notifying higher level officials of the data loss reacted with indifference and little sense of urgency or responsibility.  Although the employee met with the ISO for OPP&P on his first day back in the office following the burglary, no effort was made to determine the magnitude of the data loss at this meeting or later when the information was relayed to other responsible officials, including the District ISO and officials in the SOC.  At no time prior to the IG call on May 16, 2006, did anyone attempt to re-interview the employee to gain a better understanding of the scope and severity of the potential data loss.

Efforts to investigate the incident were further impeded by errors and omissions in the ISO incident report and were delayed due to ineffective coordination between the OPP&P ISO and the SOC incident team lead.  The senior management official with responsibility for the SOC reacted with indifference by not attempting to ascertain the scope of the potential breach and relying on lower-level employees to investigate and document the incident appropriately and in a timely manner without sufficient follow-up or oversight.  His superior acknowledged that he was not informed by any of his staff about the incident, and also did not become aware of it until May 16, 2006.

Twelve days after receiving the original incident report, the SOC had made no meaningful progress in assessing the magnitude of the event and had attempted to pass responsibility to gather information on the incident back to the OPP&P PO.  Coincidentally, this is the same individual who referred the matter to the SOC in the first place, which he did in his dual capacity as ISO for OPP&P.

## The OPP&P ISO's Incident Report Contained Significant Errors and Omissions

To ensure timely and appropriate responses to information security incidents, VA policy requires VA organizations to notify their assigned ISO promptly when such incidents occur, including incidents of unauthorized disclosure or loss of VA data.  The policy further assigns the ISO responsibility for reporting these incidents to the SOC.  The ISO for OPP&P has served in that capacity since 2002.