On the morning of May 5, 2006, the OPP&P ISO briefly interviewed and requested a written statement from the employee concerning the theft of VA data from his home. The OPP&P ISO consulted with the GS-14 District ISO responsible for coordinating ISO activities among VACO staff offices, who in turn asked him to provide her a brief written description. Later that day, the employee provided the written statement to the OPP&P ISO as requested, noting that his personally-owned laptop computer and external hard drive were taken during the burglary and that VA data files containing personal identifiers had been stored on the missing external hard drive. Based in part on his review of VA data stored on CDs and a flash drive that had not been taken in the incident, the employee listed the files he believed were on the missing hard drive.

The OPP&P ISO quickly edited the employee's statement to serve as the basis for his information security incident report, which he sent by electronic mail to the SOC and the District ISO shortly before 4:00 p.m. on Friday, May 5, 2006. The District ISO provided a copy of the report to the SOC on this same day. When editing the employee's statement, the OPP&P ISO deleted what he felt were unnecessary details of the burglary but also mistakenly changed the report to erroneously state that the CDs and flash drive— key evidence of what VA data were likely on the missing hard drive— had themselves been taken in the incident. This error resulted in a missed opportunity in the early stages of the incident to re-create the likely contents of the employee's laptop and external drive and to recognize the magnitude of the potential loss of data.

Additionally, although the employee's report contained information on the number of records (6,744) at risk in the mustard gas file, the OPP&P ISO forwarded the information without attempting to determine or report the number of records in the other files the employee had on his hard drive. Simple follow-up questions on the nature of the contents and size of the BIRLS extract or C&P list would have shown that sensitive information on millions of veterans' records were at stake. Finally, the incident report did not contain the employee's name or other contact information to facilitate confirmation of the incident.

The OPP&P ISO told us that after he filed the incident report with the information security officials, he was waiting on the results of an investigation into the matter by the SOC and did not take any further action. When asked if he re-interviewed the employee the following day (May 8, 2006) after May 5, the OPP&P ISO responded, "No. I took his email. I did not want to talk to him again. I didn't want to – if he had changed his mind or did whatever, I didn't want to know, and I didn't want to hear it. I didn't want to be involved with a conflict, having one statement or then having another statement and then having to go back. I didn't want that... If he had requested to talk to me, then I would have if he had something to share, but I gave him the opportunity to send the email and get everything in it. He sent it, and we've had no contact since."

Because the OPP&P ISO also serves as the OPP&P PO, we asked him why he did not pursue this incident as a privacy issue. He responded that he was waiting for the SOC to investigate what files were missing and to determine if the loss was a privacy

violation. Ironically, 12 days after receiving the OPP&P ISO's incident report the SOC had referred the matter back to the ISO for action as a privacy violation.

**Cyber Security Operations Officials Did Not Ensure That a Timely Investigation and Notifications Were Made Concerning the Severity of the Data Loss**

A GS-13 information technology specialist in the SOC received the OPP&P ISO's e-mail regarding the incident on Friday, May 5, 2006, in the late afternoon. As the SOC incident management team lead, he was responsible for reviewing the reported event, determining whether the incident could be confirmed, prioritizing the incident as to its severity and urgency, determining the proper incident category, and initiating incident notifications.

That same afternoon, the SOC incident management team lead left the OPP&P ISO an after-hours voice mail requesting a call back. The OPP&P ISO told us he did not receive that message until late on Monday, May 8, 2006, because he had been busy that day. On May 10, 2006, the SOC team lead notified the OPP&P ISO by e-mail that the SOC had established an incident case number for the event, that he should ensure the local privacy officer was notified, and that any additional pertinent information be forwarded to the SOC. In addition to the above confirmed contacts, the SOC team lead said that he called or left voice mail messages for the OPP&P ISO on other occasions following the incident, but the ISO told us he did not recall receiving these communications. In any event, 12 days lapsed without the SOC team lead and the OPP&P ISO, who work in the same building several floors apart, from making any progress in investigating or determining the severity of the incident. The SOC team lead told us that he determined that the incident appeared to be primarily a privacy incident rather than a cyber security incident, so he expected that the OPP&P ISO, as the OPP&P PO, had primary responsibility to obtain information on the event.

Also on May 5, 2006, the District ISO advised her supervisor, Mr. Johnny Davis, Jr., of the possibility that sensitive data was stolen from a laptop of a VA employee. As the Director of the Cyber Infrastructure Protection Service, Mr. Davis has supervisory responsibility for the SOC, and also serves as the Acting Associate Deputy Assistant Secretary for Cyber Security Operations. Mr. Davis told us that this conversation occurred in passing in the hallway and that the District ISO did not have details on the nature of the missing data. Nonetheless, Mr. Davis said he directed her to ensure that the incident was reported to the SOC and the Privacy Office, and that he relied upon her as a GS-14 employee to carry out these instructions without the need for supervisory follow-up. While she did in fact submit a report to the SOC, the District ISO acknowledged that she became disengaged from the process, and Mr. Davis did not follow up further with her or the SOC team lead to determine whether any progress was being made.

Mr. Davis also told us that the SOC routinely receives reports of incidents from ISOs, which they must attempt to confirm and analyze before making further notifications. According to Mr. Davis, however, national level incidents are to be brought to his

attention immediately so he can brief his supervisors. No such notifications were made because of the failure to develop timely information on the magnitude of the data loss by each person in the notification chain: the OPP&P ISO, the District ISO, and the SOC team lead. These failures were further compounded by Mr. Davis's failure to follow up on the actions of his staff.

It was not until May 16, 2006, when Mr. Davis' supervisor, Mr. Pedro Cadenas, Acting Deputy Assistant Secretary for Cyber and Information Security, who also serves as the Acting Deputy Chief Information Officer (CIO), asked him about the incident that Mr. Davis followed up with his staff. Finally on May 17, 2006, 12 days after receiving notification in the SOC on the incident, the SOC team lead met with the OPP&P ISO in person, interviewed him, and began preparing an incident report. Mr. Davis provided a follow-up report to Mr. Cadenas, and Mr. Cadenas reported the results to his superiors. When asked why the notification was not made earlier, Mr. Cadenas told us that in accordance with their procedures, notification is only done after an incident has been validated as a cyber security incident. In this case, his staff had determined that it was a privacy matter and not a cyber security matter, and took steps that same day to ensure that the incident was entered into the privacy violation tracking system. Accordingly, the SOC had referred the incident back to the person who initially reported the incident 12 days earlier to the SOC, the OPP&P ISO, in his capacity as OPP&P PO, who had initially stated he did not want to talk to the employee again.

## Conclusion

As the person responsible for making the first notification to information security officials, the OPP&P ISO failed to adequately and accurately describe the loss of data that occurred, particularly the magnitude of the number of records stolen. His failure to discharge his duties and responsibilities— whether by not re-interviewing the employee or by failing to respond to numerous contacts by the SOC— hampered other officials in understanding the true scope of the data breach and reacting accordingly. The OPP&P ISO acted as if he had no further responsibility after he notified the SOC. As the OPP&P privacy officer, the matter was eventually referred back to him for action.

The absence of sufficient detail concerning the magnitude of the loss hampered the efforts of the SOC team lead to assess the severity of the incident. However, despite whatever difficulties the SOC team lead may have had reaching the OPP&P ISO by telephone; he was not sufficiently diligent in obtaining information about the incident. Since the two worked in the same building, the SOC team lead should have sought out the ISO by going to see him in his office.

After reporting the incident to Mr. Davis on May 5, 2006, the District ISO became disengaged and took no further action to monitor the situation or keep her supervisor apprised of the status. Mr. Davis, who has supervisory responsibility for the SOC, learned of the incident on May 5, 2006, but did not follow up in a timely manner to ensure it was investigated and did not report it to his supervisor, Mr. Cadenas, so that notification could continue to the Chief Information Officer, Deputy Secretary, and

Secretary.  Although the SOC team lead, Mr. Davis, and Mr. Cadenas said they thought the incident was a privacy issue, VA policy identifies the loss of sensitive computer data as a reportable information security incident.  The failure to realize the magnitude of this incident, combined with a bureaucratic process that took 12 days to determine that this was a privacy issue and not an information system security issue, not only delayed notification to higher-management, it also resulted in the matter being referred back to where it originated, with the OPP&P ISO/PO.

**Recommendation**

Based on the circumstances presented in this section, we recommend that the Secretary take whatever administrative action he deems appropriate concerning the individuals involved.

## Issue 5:  Whether VA Policies Safeguard VA Information

Existing VA policies, procedures, and practices need to be consolidated and strengthened to ensure that personal or proprietary information used by VA employees and contractors are adequately safeguarded.  They also need to be readily accessible by VA and contract employees to ensure compliance.

We found that VA's policies and procedures for safeguarding information and data were not consolidated or standardized to ensure all employees were following all applicable requirements in a similar fashion, and that policies and procedures were not adequate in preventing the loss of the data.  We also found that VA employees and contractors were not adequately trained and reminded of the policies and procedures to follow to safeguard personal or proprietary information, sensitivity level designations were not always accurate, information and data provided to contractors need to be better safeguarded, and VA incident reporting procedures and controls need improvement.

Since the incident in which millions of VA records containing protected information were stolen, VA managers have attempted to strengthen policies, procedures, and controls to prevent similar disclosures, but additional actions are need to be taken to safeguard protected information and VA's automated systems.  Personal and proprietary information is referred to throughout this section as protected information.

### VA Policies, Procedures, and Practices Were Not Easy to Identify, Current, and Complete

VA needs to consolidate and standardize policies, procedures, and practices for safeguarding VA protected information and ensure that they are accessible to employees and contractors.  Our review found that policies and procedures have been issued at irregular intervals over a long period, and in separate guidelines, memoranda, directives, and handbooks, and in response to various laws and other legal requirements.  As such, there was no consolidated repository of instructions and requirements that employees could research and follow, nor was there an adequate method for ensuring that all policies and procedures issued by VA were current. Managers in each of the administrations within VA have issued their own local policies and procedures which has increased the potential for inconsistencies and further fragmented directions provided to employees and contractors.

The fragmentation of VA policies and procedures issued over a long period, and the issuance of numerous local policies and procedures issued independently by each administration within VA, contributed to many of the procedural and control inconsistencies that are noted throughout this report.

To evaluate whether VA had policies and procedures in place to safeguard against the disclosure of protected information if the information was lost or stolen, we asked VA to provide us with all relevant policies and procedures.  We received a fragmented number of policies and procedures that have been issued to employees by VA over time.  We

researched and found other policies and procedures that were not provided to us in response to our request.

To illustrate, VA provided us the following documents:

- Security Guideline for Single-User Remote Access, March 10, 2006.

- An April 20, 2006, memorandum from the Assistant Secretary for Information and Technology to remind all employees, contractors, students, and volunteers that they must complete Cyber Security Awareness training by September 30, 2006.

- A February 13, 2006, memorandum from the Assistant Secretary for Information and Technology advising VA leadership of the requirement that they must complete the Enterprise Privacy Program privacy training by September 30, 2006. The memorandum also advises of other training options including two prepared by VHA.

- VA Directive 6502, Privacy Program, June 20, 2003.

- VA Handbook 5011/5, Hours of Duty and Leave, September 22, 2005, which revised the policies and procedures for telework.

In addition to the documents provided by VA, our research identified additional VA Directives and Handbooks on the subject of IT security and privacy of information:

- VA Directive 6210, Automated Information Systems Security, January 30, 1997, and VA Handbook 6210, which establishes policies and procedures for cyber security.

- VA Handbook 6502.1, Privacy Violation Tracking System, March 25, 2004.

- VA Handbook 6502.2, Privacy Impact Assessment, October 21, 2004.

- VA Handbook 6300.4, Procedures for Processing Requests for Records Subject to the Privacy Act, January 12, 1998.

- VA Handbook 6300.5, Procedures for Establishing and Managing Privacy Act Systems of Records, January 12, 1998.

Our review confirmed that there was no consolidated and current set of policies and procedures that employees and contractors could access to ensure all applicable requirements are being met. We found that the VA intranet posed a considerable challenge to employees seeking to learn about VA policies on privacy and cyber security. There was no direct link on the main VA home page to VA-wide directives; therefore, employees not familiar with the Office of Information Technologies Directives

Homepage must conduct multiple time-consuming searches and sort through tens of thousands of "hits" before locating pertinent directives. Without clearer directions on how to locate these directives, VA will not achieve compliance.

We also found that managers within each region and local facility within VA developed and implemented their own policies and procedures on many of these requirements, which further subjected the criteria to multiple, differing interpretations.

**VA Policies and Procedures for Safeguarding Against the Disclosure of Protected Information Were Not Adequate to Prevent the Data Loss Incident**

VA did not have sufficient policies and procedures in place to prevent this recent data loss incident, or any other such incident, that would have involved the disclosure of protected information. We did not identify any VA policy that prohibited employees or contractors from removing protected information from the VA worksite, required employees or contract employees to obtain authorization before removing the information, prohibited the use of non-VA computers to process or store protected information, or that required safeguards such as password protection or encryption when protected information was stored on portable storage media or non-VA computers.

VA Directive 6502, Privacy Program, which was provided to us by VA in response to our request, states that VA will ensure that all privacy-protected data maintained by or for, VA in any medium, is kept confidential, except when disclosure is permitted by law. The Directive does not specify how the information will be protected and does not require safeguards for proprietary information.

The Privacy Service in the Office of Information and Technology is responsible for VA Directive 6502. The Director, Privacy Service, told us the administrations, particularly, VHA, have great latitude in terms of establishing local policies and, unless Privacy Service is asked to look at a policy, they "have no idea what exists out there." The Privacy Officer for VHA told us that they do not review all of the policies issued by field facilities. This decentralized approach to policy making leads to inconsistencies in protecting information.

None of the employees we interviewed was able to identify a policy or other requirement in place prior to May 3, 2006, that established specific requirements for safeguarding protected information when removed from the worksite. One of the documents VA provided in response to our request was titled "Security Guidelines for Single User Remote Access" (Security Guideline), March 10, 2006. We determined that this document was not an approved or published VA Directive, Handbook, or policy at the time of the incident or at the time it was provided to us. Nonetheless, we reviewed the document and determined that the provisions did not provide adequate safeguards for information stored on portable media. Also, statements throughout the document indicate that the guidelines were only applicable to employees with remote access to the VA intranet.

Our research identified a reference to removing Privacy Act protected information in Section 9 of VA Handbook 6300.4, Procedures for Processing Requests for Records Subject to the Privacy Act, issued January 12, 1998. Paragraph b (2) of Section, Systems of Records on Personal Computers, states:

> "Records subject to the Privacy Act that are maintained on PCs must be protected from unauthorized disclosure in the same manner as all records subject to the Act. To ensure proper protection of records on 'floppy disks,' procedures will be established by management to ensure these disks are not removed or used outside Government buildings or installations without proper authorization and documentation. 'Floppy disks' containing personal information subject to the Act will be properly secured when not in use to prevent unauthorized use or access."

Not only is the Handbook outdated with respect to the current technology used to store information, employees would not be familiar with the cited provision unless they were processing a request for Privacy Act records. The provision in Section 9 does not prohibit removing protected data from the worksite. While it does require that the agency implement procedures to ensure data is not removed from the worksite without proper authorization and documentation, we could not identify any such procedures. Also, the individuals we interviewed were not aware of any policies or procedures.

We also could not identify any VA policy in effect at the time of the incident that required protected information stored on portable media be password protected or encrypted, or that the media devices or hard copy of records be secured by any specific means. VA Handbook 6300.4 only requires that "floppy disks" containing personal information subject to the Privacy Act will be "properly secured when not in use to prevent unauthorized use or access." Criteria to satisfy the "properly secured" requirement were not delineated in VA Handbook 6300.4 or any other VA policy that we were provided or that we located ourselves using the VA intranet.

In response to our request, VA provided VA Handbook 5011/5, which provides policy and procedures for telework. Although the employee was not teleworking when the incident occurred, the telework policy is significant because the program supports the concept of employees taking work from the VA worksite to their home or other remote location. The policy only prohibits taking, using, and storing "classified" information at the employee's home or telecenter. At VA, however, most VA employees do not handle classified data. The telework policy specifically allows employees to remotely access Privacy Act materials and VA data and systems provided the employee agrees to protect the records from unauthorized disclosure or damage. The policy also requires employees to comply with all legal requirements of the Privacy Act and other statutes, policies, and procedures, to protect the VA data and systems to which the employee will have access under the telework arrangement, but lacks sufficient detail to say how this should be done.

The use of non-VA computers to work at home or other remote location was not prohibited by VA's telework policy. Also, this policy does not require the same safeguards VA requires for VA owned computers. The policy does not require that personal computers be password protected, have antivirus or intrusion software, or that confidential or other protected information be encrypted or password protected, and does not have requirements for the destruction of data, even when non-VA computer is discarded.

Employees who use VA's Virtual Private Network (VPN) to access the VA intranet remotely are required to comply with requirements for remote access. This provision has limited impact because employees are not required to have remote access to work from home or other remote site and the policy permits the use VPN on non-VA computers. Remote access through VPN only protects the firewall for VA's intranet; it does not prohibit the employee from downloading protected information and does not protect the information after it has been downloaded onto a non-VA computer. The ISOs, who have responsibility for obtaining signed Rules of Behavior for VPN users, told us that they do not have any involvement with telework arrangements unless the employee is using remote access to the VA intranet.

Our review showed that current VA policies and procedures need to be clarified to distinguish between information law and information security law requirements. Information laws and regulations identify information to be protected from disclosure, establish the conditions under which the information may be disclosed, and prescribe penalties for illegal disclosure. Information law requirements applicable to personal information in records VA maintains include the Privacy Act;[1] VA confidentiality statutes,[2] and Health Insurance Portability and Accountability Act (HIPAA) regulations.[3] These laws also prohibit the disclosure of proprietary information maintained by VA.[4]

Conversely, information security laws focus on protecting automated systems that store the information from unauthorized access. Information security laws require VA to take action to protect the automated systems that contain protected information from unauthorized intrusions, unauthorized access, and viruses that can impact both the information system and the integrity of the information. The Federal Information Security Management Act of 2002 (FISMA)[5] provides the framework for ensuring the effectiveness of information security controls over information resources that support Federal operations and assets.

The circumstances surrounding the theft of the employee's personal external hard drive on which protected information was stored highlight a gap between information law and information security law requirements, and raises issues concerning the VA policies and

---

[1] Title 5 U.S.C. § 552a.
[2] Title 38 U.S.C. §§ 5701 (protects claims for benefits, including names and addresses), 5705 (protects medical quality assurance records), 7332 (protects records relating to the treatment of drug and alcohol abuse, sickle cell anemia, and HIV).
[3] Title 45 CFR §§ 160 *et seq.*
[4] Title 18 U.S.C. § 1905.
[5] Title III of Public Law 107-347, E-Government Act of 2002.

processes designed to ensure compliance with these laws and how problems are investigated and resolved.

Our review found that the gap is in the assignment of responsibility for establishing and enforcing VA policy with respect to these two sets of laws. Privacy Officers see their role as identifying the information that should be protected and the criteria for disclosure. Information Security Officers see their role as safeguarding information by protecting the automated systems in which the information is stored. The gap is safeguarding information not stored on VA automated systems.

VA policies did not sufficiently address safeguards for protecting information from loss or theft when the information does not reside in a VA automated system. This includes hard copy records as well as records stored electronically on portable media storage devices and non-VA computers. Portable storage devices allow employees and contractors to store and transport millions of records to alternate work sites. While this could improve the efficiency of Government by allowing employees and contractors to work from remote and non-traditional locations, there are inherent risks associated with the removal of the data from a protected environment that can result in potential disclosure of protected information through loss or theft that need to be addressed in VA policies and procedures.

Clarifications to VA policies are also needed in describing the terminology used when discussing issues of information law versus information security law. For example, the word "system" as used by ISOs refers to the automated systems, hardware, and program applications that store the information; whereas to a PO the word "system" refers to a "system of records" as defined in the Privacy Act. The Privacy Act and other confidentiality statutes use terms such as "privileged" or "protected" information, whereas FISMA uses the term "confidential" and VA policies use the term "personal" or "sensitive" to describe certain information. Personal information pertains to personal identifiers related to individuals such as social security numbers, dates of birth, claims numbers, and health information. Proprietary information relates to information provided by vendors during the acquisition process and internal configuration and design information concerning VA automated systems. We concluded that VA needs to apply consistent and comprehensive terminology throughout its policies and procedures to better standardize its criteria for safeguarding protected information.

## VA Training Tools Are Not Adequate to Ensure that VA and Contractor Employees Are Sufficiently Trained

Our review of employees' and contractors' training on policies and procedures found that cyber security and privacy awareness trainings were inadequate. VA requires all VA employees and contractors who have access to VA's automated systems to complete training annually on cyber security awareness and privacy. We reviewed all of the training modules to determine whether they effectively informed employees and contractors about their duties, responsibilities, and accountability for protecting VA's automated systems and protected information.

We found that these modules are difficult to locate, do not adequately address safeguarding protected information when it is removed from VA premises, are not constructed to ensure that employees are tested on comprehension of course content, and that most modules are general in nature and do not contain citations or links to applicable directives.

In our search of the VA intranet, we experienced difficulty locating the required training, netting over 100,000 possible matches when using the phrase "Cyber Security Training." Our search also revealed that a link on the VA intranet provides the questions and answers to questions asked during the training and allows employees to print a "Certificate of Training" without accessing the training module.

Cyber Security Awareness training is basic in nature and does not cite any VA directive, handbook, or other policy relating to cyber security. For example, the training does not cite VA Directive 6210, which prohibits using e-mail to transmit protected information unless the information is encrypted. It also does not cite VA Handbook 6300.4, which at the time of the data loss, was the sole VA directive that addressed protection of information when removed from VA premises on floppy disks.

We reviewed the three online training modules on privacy available to employees: "Privacy, Department of Veterans Affairs, and You," "Privacy Awareness for Senior Executives," and "VHA Privacy Policy Web Training," and found varying levels of specificity and effectiveness.

- "Privacy, Department of Veterans Affairs, and You," which is geared to employees needing a general knowledge on privacy requirements, provides an adequate overview of privacy issues but does not reference specific laws or VA policies except the provision in VA Directive 6300 that addresses the destruction of records.

- The "Privacy Awareness for Senior Executives Training" provides links to directives, manuals, and policies, and more detailed information on privacy protection, but lacks helpful ideas on how senior managers can implement policies to safeguard data adequately. A June 7, 2006, memorandum from the Under Secretary for Benefits to VBA employees states that the "Privacy Awareness for Senior Executives" training module does not satisfy the Secretary's training requirement.

- The "VHA Privacy Policy Web Training" is the most detailed and comprehensive with respect to the applicable information laws and HIPAA requirements. It addresses the need to safeguard confidential information, but does not provide any specific requirements for how to protect the information.

None of the courses adequately tests employees' comprehension of course content. Employees can quickly click the screens to answer questions on cyber security without reading all information, and the VHA course can be completed without answering the test questions. All training modules require updating to reflect policies issued in the wake of the data loss.

In response to the data loss, the Secretary directed that all VA employees and contractors to complete training on cyber security and privacy awareness by June 30, 2006. While this is a good first step in increasing employee and contractor awareness, actions should be taken to reassess the sufficiency of these training materials, making them easier to locate and access, and strengthening the comprehensiveness of these courses.

## VA Employees and Contractors Do Not Have Appropriate Sensitivity Level Designations

Our review of VA policy and selected employees' and contractors' sensitivity level designations found that VA employees either do not have appropriate sensitivity level designations or designations were inaccurate.

VA Directive 0710 establishes policy for the management of the personnel suitability and security program. The Directive pertains to VA applicants, appointees, and contract personnel for identification of a position's risk level as it relates to the efficiency and integrity of the Federal service and for determining the scope of a background investigation as it relates to risk level. The Directive states that high and moderate risk level positions are normally designated as Public Trust, which may involve policy making, major program responsibility, public safety and health, law enforcement duties, fiduciary responsibilities, etc.

VA Directive 0710 requires background screenings commensurate with the risk involved for any positions that require access to VA information systems. The Directive requires assessments for all positions by the appropriate ISO for the possible risk or harm that could result from an incumbent's loss, misuse, or unauthorized access to, or modification of, VA information, including the potential for harm or embarrassment to an individual who is the subject of the records. Although the ISO does the assessment, the final determination rests with the program office with delegated authority to make final suitability determinations.

In the present case, VA officials recognized this problem once they realized that the employee, who had legitimate access to a large volume of protected information, had never been vetted through the background investigation process for suitability. The employee's risk level, as indicated on his VA Form 2280, Position Sensitivity Level Designation, dated April 5, 2001, indicates that the position has a limited impact on the efficiency of the service with multi-agency scope of operations.

Our review revealed that a number of other employees assigned to OPP&P, some of whom have similar data access privileges, also had no suitability determinations. In fact, one of the systems of records that these employees have access to is BIRLS, one of the system extracts reported stolen on May 3, 2006. A recent assessment conducted at the request of VBA determined that the information sensitivity for BIRLS/VADS (Veterans Assistance Discharge System) was moderate for confidentiality, integrity, and availability. The evaluation also concluded that BIRLS/VADS should be classified as a mission critical system.

Position sensitivity determinations also apply to contract personnel. Information Letter (IL) 90-0106 issued by VA Office of Acquisition and Materiel Management on July 16, 2001, provided procedures to facilitate the security programs for VA automated information systems and guidance on the acquisition process relating to the established background requirements for contractor personnel. The IL states that VA policy requires that contracts contain an investigative requirement for the contractor position based on the pre-determined position sensitivity level designation. The IL further states that automated systems that contain information that is subject to the Privacy Act, or the modification of which could adversely affect the performance of Federal programs, are designated as sensitive. The sensitivity designation in VHA is determined by each VISN office, which has resulted in inconsistent and inaccurate designations.

A review of 20 selected proposals for contracts for physician services at VA medical centers showed that the positions in 16 proposals were designated as low-risk and a no-risk determination was made in the remaining 4 proposals. However, all of the physicians providing services under the contracts will have access to VA automated systems, including patient care records. The designation of low-risk is inconsistent with the level of responsibility and impact that these health care providers have on VA programs and operations.

Staff at one of the three medical centers we visited told us that the level of risk was minimal because the physicians did not have access to sensitive information, even though they had access to Veterans Health Information System Technology Architecture (VistA). Another medical center indicated the level of risk determination was impacted by the cost of a background investigation, not the actual risk involved. We have previously recommended in our FISMA reports that risk assessments be part of every position description and contract.

VA needs to insure that all positions have appropriate sensitivity designations and have nationwide designations for positions that have like or similar duties and access to VA's automated systems. Without these safeguards, VA systems and protected information at risk.

## Protected Information Provided to Contractors Is Not Adequately Safeguarded

Our review of applicable VA policies, interviews of VA management, reviews of contract documents relating to solicitations and contracts from prior and ongoing OIG

investigations, audits, and reviews, and reviews of contract administration records at three VHA facilities determined that protected information provided to contractors was not adequately safeguarded.

We found that VA policy requires inclusion of two specific clauses in contracts that include access to Privacy Act protected information, as required in the Federal Acquisition Regulation (FAR). VA Handbook 6210, "Computer Security Training Protocols," requires training for all VA elements and non-VA organizations that use VA automated systems, including contractors, which meets the requirements of FISMA.

In our interviews with CIOs, POs, and ISOs, we were assured that contractors who were provided privacy information and/or access to VA's automated systems, including systems of records with patient related information, were notified of the provisions of the Privacy Act, other VA confidentiality statutes, VA Directive 6502, the associated handbooks, VA's cyber security policies, etc. We also were told that contractors were required to sign Rules of Behavior to have access to VA systems and that they were required to report privacy violations as required by VA Directive 6502.1.

In our review of contract documents, we found that many contracts did not consistently include clauses to protect the information or the systems, contractors were not required to take and/or did not take Cyber Security and/or Privacy Awareness training, background investigations were not required or not done, and contractors were not always required to sign Rules of Behavior to access VA's automated systems. Also, contract documents seldom referenced or included VA policies relating to safeguarding protected information or the security of automated information systems.

We selected 20 proposals submitted in response to solicitations for contracts for physician services that were to be awarded to VA affiliates under the provisions of 38 U.S.C. § 8153. All 20 were subject to legal/technical review prior to being sent to the OIG Office of Contract Review for a preaward review. The results show that the majority of the proposals reviewed did not require contractor personnel to comply with VA's training requirements, to undergo background checks, or to report privacy violations as required by VA Handbook 6502.1. The results of our review are as follows:

| Required Training | | | Required Compliance | | | | |
|---|---|---|---|---|---|---|---|
| Privacy | Cyber Security | HIPAA | Background Checks | 5 U.S.C 552a (Privacy Act) | 38 U.S.C. 5701, 5705, 7332 | Key Personnel Identified | Reporting of Privacy Violations |
| No - 19 | No - 15 | No - 18 | No - 3 | No – 0 | No - 7 | No - 9 | No - 18 |
| Yes - 1 | Yes - 5 | Yes - 2 | Yes - 17 | Yes - 20 | Yes - 13 | Yes - 11 | Yes - 2 |

In addition to reviewing the 20 proposals, we visited three VA medical centers and reviewed documentation relating to the administration of contracts with affiliates for physician services. The following examples illustrate the vulnerabilities that exist with VA contracts in protecting VA systems and data:

- A contract for anesthesia services in effect since July 2005 had 29 physicians as potential providers. All 29 had been provided access to the surgical primary and secondary menus in VistA, which allows the user to view, enter, and edit patient information. None of the 29 physicians had any background checks. The Supervisory Human Resource (HR) Specialist told us that they generally do not conduct background checks for anesthesiologists because their jobs are not classified as sensitive positions. The Medical Center Director told us that all physicians have lower-level background checks because they do not deal with sensitive information. We were told that for low-level rated positions, HR only needs to check references and obtain fingerprints. Only one of the 29 anesthesiologists had fingerprints on file and no other checks were done on any of the providers. Only five had Privacy Awareness training and seven had Cyber Security Awareness training, and three did not sign Rules of Behavior.

- A contract for radiology services awarded on October 1, 2005, identified 19 physicians who could provide services under the contract. Eighteen physicians had been authorized access to VistA and 13 had VPN accounts for remote access. We found signed Rules of Behavior for all 18 physicians having VistA access. Background investigations had been completed on 12 physicians. No requests for background investigations had been made for five of the physicians and background investigations were requested and pending for two physicians. The positions were all designated as non-sensitive, low-risk. Although Cyber Security Awareness and Privacy Awareness training had been completed by all 19 physicians, 8 of the physicians took the training after we announced our visit. An employee in the Chief of Staff's office acknowledged that the training was completed based on our planned visit.

We reviewed contracts related to other OIG audits and reviews and found:

- The Statement of Work (SOW) for a contract awarded in 2005 by VHA to a consultant for the evaluation of VHA's purchase of health care from the private sector stated the contractor would have access to both printed and electronic documents that may be protected by the Privacy Act and Title 38 and that unauthorized disclosure is a criminal offense. FAR clauses 52.224-1 (Privacy Act Notification) and 52.224-2 (Privacy Act) were included in the SOW. The specific Title 38 provisions were not identified and Privacy Awareness training was not required. The SOW stated that the contractor may have access to proprietary information and agreed by the terms of the contract to protect the information and to follow all Government rules and regulations regarding information security. The specific rules and regulations were not identified, and VA's Cyber Security and Privacy Awareness training were not required. Although the contractor was advised that background

checks may be required, the task was not assigned a sensitivity level and specific background checks were not required.

- On May 13, 2005, VA issued a task order against an interagency agreement with DoD to have a Federally funded research group, IDA, perform a nationwide analysis relating to the variation in disability compensation claims, rating, and monetary benefits. Performance required access to protected information. Neither the interagency agreement nor the task order stated that the information provided the contractor will be protected under the Privacy Act or any other confidentiality statute. There was no requirement for Cyber Security or Privacy Awareness training, no sensitivity level determination, and no requirement for background investigations.

**Policies and Procedures for Reporting and Investigating Lost or Stolen Protected Information Are Not Well Defined in VA Policies**

Our review of relevant laws and VA policies and interviews of VA personnel determined that VA policies did not include adequate procedures reporting and investigation incidents involving lost or stolen protected information. In addition to not implementing procedures required by FISMA, VA did not implement the National Institute of Standards and Technology (NIST) recommendations for security incident responses. We also found three VA policies that address reporting privacy violations and information security incidents to be inconsistent with respect to the information that should be reported, the time frames required for reporting, and to whom the incident should be reported, including reporting to law enforcement.

Section 3544 b (7) of FISMA requires VA to implement an agency-wide information security program that includes procedures for detecting, reporting and responding to security incidents. These procedures must include notifying and consulting with the Federal information security center as well as appropriate law enforcement agencies and relevant Offices of Inspector General. We did not identify a VA policy that implements this requirement.

NIST Special Publication, "Computer Security Incident Handling Guide" (Guide), does not have specific requirements for reporting to law enforcement but does suggest that the response team become acquainted with various law enforcement representatives before an incident occurs to discuss conditions under which incidents should be reported to them, how the reporting should be performed, what evidence should be collected, and how the evidence should be collected. We did not identify any VA policies implementing the NIST recommendations.

VA Handbook 6300.5, Procedures for Establishing and Managing Privacy Act Systems of Records, Section 6, Description of Privacy Act Reviews, paragraph g, states that VA employees are required to report any suspected criminal violations of the Privacy Act. It does not provide any specific time frame or instructions for reporting. This provision is not visible to the average employee because it is contained in a policy applicable to

employees involved in establishing and maintaining Privacy Act systems of records and in a paragraph that impacts employees conducting Privacy Act reviews.

VA Directive 6210, Automated Information Systems Security, has not been updated since it was issued in January 1997. The Directive requires VA to establish, maintain, and enforce AIS security incident reporting and response capability to ensure that computer security incidents are detected, reported, and corrected at the earliest possible time. The Handbook requires that security incidents be reported to the ISO within 48 hours of the occurrence to the VA Information Resources Security Officer. The policy identifies specific information that must be reported, including whether the Inspector General or appropriate law enforcement organization was notified. It does not specifically mandate reporting the incident to the VA OIG or to another VA law enforcement entity, and it does not seem to pertain to the May 3, 2006, incident because the incident did not involve an unauthorized intrusion into VA's automated system.

The Privacy Act and other information laws do not require reporting incidents. To comply with the provisions of HIPAA, VA issued VA Directive 6502 and VA Handbook 6502.1. VA Handbook 6502.1 establishes VA-wide procedures for recording privacy-related complaints and violations in the VA Privacy Violation Tracking System (PVTS). The PVTS supports HIPAA's "documentation of complaints" requirement. The Handbook assigns POs the responsibility for recording all privacy-related complaints and violations, their updates, and resolutions to the PVTS as soon as possible. The PO also is tasked with resolving complaints and violations as soon as possible through corrective actions which include education, reprimand, sanction, or a determination that there was no breach.

The process outlined in the Handbook is the same regardless of the magnitude of the violation. The only provision for referring a complaint or violation through the privacy hierarchy is if the PO cannot resolve the complaint or violation. In contrast to VA Handbook 6210, VA Handbook 6502.1 does not provide specific time frames for reporting, investigating, or resolving complaints or violations and does not specify what information must be ascertained during an investigation.

VA Directive 6502, paragraph g (13), requires that VA officials "ensure that all alleged breaches of applicable Federal privacy law, that on their face, constitute a criminal violation of law, are referred for investigation to the Office of Inspector General." Whether this Directive applied to the May 3, 2006, incident is difficult to determine, because it would all depend on the facts presented at the time of the incident and the how the person receiving this information interpreted it. The application of this matter is discussed in more detail in Issue 4.

**Policy Changes Implemented by VA Since the Incident Are a Positive Step, but More Needs to Be Done to Prevent Similar Incidents**

Our review of policy changes and communications issued by VA since the date of the information security incident determined that actions taken since May 3, 2006, are insufficient to prevent similar incidents in the future. We found that VA has taken positive steps in addressing the policy inadequacies, but additional actions are needed.

VA has issued a number of statements and directives affecting the use of information by VA employees. VA has taken the following actions since May 3, 2006.

- May 22, 2006 – Memorandum to all VA employees required all employees to complete Cyber Security and Privacy Awareness training by June 30, 2006.

- May 26, 2006 – Directive required all employees to complete Cyber Security and Privacy Awareness training by June 30, 2006.

- June 5, 2006 – Memorandum required all organizations to identify teleworkers by June 6, 2006.

- June 6, 2006 – Memorandum suspended the practice permitting VBA employees to remove claims files from the regular workstations in order to adjudicate claims from an alternative worksite.

- June 6, 2006 – Memorandum issued VA IT Directive 06-2, which requires supervisory approval before removing confidential and Privacy Act protected information from the worksite in any data format.

- June 7, 2006 – All organizations were directed to complete a data access inventory for each employee by June 21, 2006.

- June 7, 2006 – VA Directive 6504, Restrictions on Transmission, Transportation and Use of, and Access to, VA Data Outside VA Facilities.

VA IT Directive 06-2 addresses some of the gaps in policy, including requirements for data encryption and password protection in accordance with VA policy when employees are authorized to remove electronic data. Directive 06-2 also requires employees who lose confidential or Privacy Act protected data to report the loss immediately to the facility or staff office ISO, the PO, and the employee's immediate supervisor. However, Directive 06-2 does not cover issues relating to loading, processing, and storing protected information on a non-VA computer or the destruction of the data/computer. In addition, it is not clear whether use of the term "confidential" refers to personal and proprietary information, as the term is used in FISMA, or if this means "confidential" as used by the DoD. If the later, the Directive does not protect proprietary information.

Directive 6504 contains policy for 23 different items. With respect to the circumstances relating to the recent incident involving loss of data, the Directive permits VA employees to transport, transmit, access, and use VA data outside VA facilities only when such activities have been specifically approved by the employee's supervisor. The Directive

prohibits the use of non-VA owned equipment to access the VA Intranet remotely or to process VA protected information except as provided in the Directive.

However, we found that the Directive was difficult to understand; too technical for the average employee to understand; used terms, such as "appropriate," that were too vague to ensure compliance; and made references to other applicable policies, guidelines, and laws without identifying them.

The following actions by VA will further ensure protected information is safeguarded:

- Issue one clear, concise policy on safeguarding protected information when stored and not stored on VA's automated systems.  The policy should clearly define what information is protected from disclosure.

- Address policies and procedures individually for accessing, using, transporting, and transmitting protected information.

- Require that all VA employees and contract employees acknowledge that they received, reviewed, and understand the policy.

- Modify Cyber Security and Privacy Awareness training to include references to all relevant VA policies and that users complete the training in their entirety to obtain certification.

- Have one Privacy Awareness training program for all employees.

- Consider prohibiting the use of non-VA computers to store and process VA protected information unless VA can be assured that the computers have the same level of safeguards to protect information as required for VA computers.

- Ensure that all VA contracts contain terms and conditions to safeguard VA protected information.

- Hold individuals accountable for non-compliance as well as responsible managers, supervisors, contracting officers, and contracting officer's technical representatives.

Under the Privacy Act and other information laws, the Secretary is ultimately responsible for ensuring that protected information is safeguarded from inappropriate disclosure.  To this end, the Secretary has the authority to issue and enforce national policy affecting VA employees and contractors who have access to protected information.  Centralized policies for handling protected information will help ensure consistency in safeguarding the information and preventing the fragmentation, overlap, and the confusion that occurs when entities in VA issue their own policies.  VA policies should also establish clear processes and procedures with well defined responsibilities for the reporting and investigation of protected information.

Review of Issues Related to the Loss of VA Information Involving the Identity of Millions of Veterans

## Conclusion

Our review found that VA did not have policies and procedures in place that would have prevented the potential disclosure of protected information. The patchwork of existing VA policies was difficult to locate, fragmented, overlapping and confusing. VA's Cyber Security and Privacy Awareness training do not ensure that employees and contractors are adequately familiar with the applicable laws and VA policies. The fact that VA does not adequately assess sensitivity levels to positions increases the risk of future disclosure problems. In addition, VA contracts that involve access to protected information and access to VA's automated systems do not adequately protect the information or the automated systems. We also found that VA did not have clear, consistent policies and procedures in place to ensure employees take timely and appropriate action when information is lost or stolen and that VA needs to take further action to ensure similar disclosures of protected information are prevented in the future.

### Recommendations

To address the issues raised in this section, we recommend that the Secretary:

a.    Establish one clear, concise VA policy on safeguarding protected information when stored or not stored on a VA automated system, ensure that the policy is readily accessible to employees, and that employees are held accountable for non-compliance.

b.    Modify the mandatory Cyber Security and Privacy Awareness training to identify and provide a link to all applicable laws and VA policy.

c.    Ensure that all position descriptions are evaluated and have proper sensitivity level designations, that there is consistency nationwide for positions that are similar in nature or have similar access to VA protected information and automated systems, and that all required background checks are completed in a timely manner.

d.    Establish VA-wide policy for contracts that require access to protected information and/or VA automated systems, that ensures contractor personnel are held to the same standards as VA employees, and that information accessed, stored, or processed on non-VA automated systems is safeguarded.

e.    Establish a VA policy and procedures that provide clear, consistent criteria for reporting, investigating, and tracking incidents of loss, theft, or potential disclosure of protected information or unauthorized access to automated systems, including specific timeframes and responsibilities for reporting within the VA chain-of-command and, where appropriate, to OIG and other law enforcement entities, as well as appropriate notification to individuals whose protected information may be compromised.

## Issue 6:  Whether Audits and Reviews of VA's Information Management Security Program Controls Continue to Identify Vulnerabilities

During the past several years we have conducted a number of audits and evaluations on information management security and IT systems that have shown the need for continued improvements in addressing security weaknesses.  We have reported VA information security controls as a material weakness in the annual Consolidated Financial Statements (CFS) audits since the FY 1997 audit.  Our FISMA audits have identified significant information security vulnerabilities since FY 2001.  We continue to report security weaknesses and vulnerabilities at VHA health care facilities and VBA regional offices where security issues were evaluated during our Combined Assessment Program (CAP) reviews.  We have also identified IT security as a Major Management Challenge for the Department each year for the past 6 years.

### Consolidated Financial Statement Audits Continue to Report Information Security as a Material Weakness

As part of the CFS audit, IT security controls have been reported as a material weakness for many years.  A material weakness is defined as a weakness in internal control that could have a material effect on the financial statements and not be detected by employees in the normal course of their business.  We have reported that VA's program and financial data are at risk due to serious weaknesses related to: inadequate implementation and enforcement of access controls over access to financial management systems and data; improper segregation of key duties and responsibilities of employees in operating and maintaining key systems; underdeveloped IT service continuity planning; and inconsistent development and implementation of system change controls.

Testing disclosed strong access authentication mechanisms and administration of user access have not been consistently implemented and enforced.  There were ineffective monitoring and review of user access profiles.  Intrusion detection mechanisms, and coordination and communication between Central Incident Response group and local security functions were not operating promptly and effectively to detect and resolve potential security violations from internal sources.  Some systems have not been configured to support proper implementation of system segregation of duties.  A business continuity plan at the departmental level has not been fully developed to provide overall guidance, direction, and coordination for IT service continuity and testing at certain medical facilities and data centers has not been consistently scheduled and adequately performed.  Testing also disclosed that VA policy does not provide uniformed guidance for a wide-range of new and legacy applications to facilitate consistent implementation and effective monitoring of changes.  As a result of these vulnerabilities, we recommended that VA pursue a more centralized approach, apply appropriate resources, and establish a clear chain-of-command and accountability structure to implement and enforce IT internal controls.

CFS audits have also found that VA managers needed to:

- Improve access control policies and procedures for configuring security settings on operating systems, improve administration of user access, and detect and resolve potential access violations.

- Evaluate user functional access needs and system access privileges to support proper segregation of duties within financial applications. Assign, communicate, and coordinate responsibility for enforcing and monitoring such controls consistently throughout VA.

- Develop a service continuity plan at the departmental level that will facilitate effective communication and implementation of overall guidance and standards, and provide coordination of VA's service continuity effort. Schedule and adequately test IT disaster recovery plans to ensure continuity of operations in the event of a disruption of service.

- Develop a change control framework and, within that framework, implement application specific change control procedures for mission critical systems.

VA has implemented some recommendations for specific locations identified but has not made corrections VA-wide. For example, we found violations of password policies which management immediately corrected, but in following years, we found similar violations at other facilities. We also found instances of terminated or separated employees with access to critical systems identified at various locations which management corrected, only to discover similar instances elsewhere. Consequently, we continue to report information security as a material weakness, which was highlighted in the VA FY 2005 Annual Performance and Accountability Report, dated November 15, 2005.

## Annual Evaluations of VA's Information Security Program Have Identified Vulnerabilities That Remain Uncorrected

In all four FISMA audits of the VA Security Program issued since 2001, we reported vulnerabilities that continue to need management attention. These reports highlight specific vulnerabilities that can be exploited, but the recurring themes in these reports are the need for centralization, remediation, and accountability in VA information security. Since the FY 2001 report, we reported weaknesses in physical security, electronic security, and internal reporting, and since 2002, we also reported weaknesses in wireless security and personnel security. Additionally, we have reported significant issues with implementation of security initiatives VA-wide.

The FY 2004 audit also emphasized the need to centralize the IT security program, implement security initiatives, and close security vulnerabilities. We previously recognized that the Office of the Assistant Secretary for Information and Technology/CIO office needed to be fully staffed, and that funding delays and

resistance by offices to relinquish their own security functions and activities delayed implementation of the fully centralized CIO contemplated by our prior recommendations. The CIO's comments to the report referenced an April 2004 VA General Counsel opinion that the CIO interpreted as restricting his office from gaining the authority to enforce compliance with the VA information security program, and hindering his ability to address the identified vulnerabilities. We again recommended that VA fully implement and fund a centralized VA-wide IT security program.

The following 17 issues continue to warrant management attention.

1. Implementation of a Centralized Agency-Wide IT Security Program

The CIO is VA's focal point for IT matters. The Secretary has designated the Assistant Secretary for Information and Technology as the VA CIO. Although the CIO is responsible for VA's information systems, operational controls were decentralized among each administration within VA. The operational control was, until recently, vested with VHA, VBA, National Cemetery Administration (NCA), and other program offices in VA. The CIO provided guidance and the tools to support the activities with operational control to secure VA systems, but the CIO did not have the ability to enforce or hold officials accountable for non-compliance. The CIO was responsible for the general management of all VA IT resources, including policy guidance, budgetary review, and general oversight. However, the implementation of the information security program was accomplished by VA personnel who were not under the direct supervision or control of the CIO.

VA informed Congress that it plans to move towards a "federated IT system" to realign department-wide IT operations and maintenance responsibilities under the direct authority of the CIO. The main feature of the realignment will place VA's IT budget, along with IT professionals involved in operation and maintenance work, directly under the authority of the CIO. However, IT employees involved in system development will remain under their respective administrations and staff offices (e.g., VHA, VBA, NCA, and some program offices). Given that the planned realignment has just begun, VA's federated IT system implementation plans will need further study. For example, we will need to review whether existing IT systems and operations under the purview of the CIO will efficiently and effectively communicate with newly designed applications implemented by these system development offices.

2. Implementation of a Patch Management Program

VA continues to review and address patch management issues to find long-term solutions. We previously identified a number of critical patches that were either not installed or not appropriately implemented at the VA facilities reviewed. VA did not have an enterprise-wide solution that could directly connect to over 250,000 points within VA. During our FY 2005 audit, VA continued to evaluate solutions to remediate this condition. VA was still in the process of developing and fully deploying a patch management program. VA's CIO identified roles and responsibilities to address VA

Enterprise Patch Management processes and standard operating procedures. A January 7, 2005, memorandum, Enterprise Patch Management, signed by the CIO, details patch management roles, responsibilities, and special considerations.

3. Electronic Security

Our reviews conducted at new sites visited during FY 2005 found potential vulnerabilities that we previously identified relating to password controls, remote access, and securing critical files. Additionally, we continued to find security vulnerabilities related to the lack of segregation of duties; unsecured critical files, which could allow attackers access to password files; and inappropriate access through remote access software. Our field work at facilities not previously visited in prior years found potential vulnerabilities warranting management attention. The reviews indicate that while managers at sites visited are addressing vulnerabilities identified during these reviews, sites not visited in prior years have not been advised that the vulnerabilities identified may be systemic in nature. VA needs a consistent approach at all of its facilities to effectively monitor networks and to use tools, such as electronic scanning, to proactively identify and correct security vulnerabilities.

4. Personnel Security

In FY 2005, we continued to find previously identified weaknesses related to position descriptions and training of VA employees and contractors. Sensitive position descriptions needed better documentation. We found the sensitivity rating was inaccurate for some employee positions at facilities reviewed and that position descriptions needed to more specifically address the levels of access relative to the positions' duties and responsibilities.

5. Background Investigations

VA needs to ensure that employee and contractor background investigation requirements are adequately identified and addressed. In FY 2005, we identified instances where background investigations and reinvestigations were not initiated in a timely manner on employees and contractors, or were not initiated at all.

6. Deployment and Installation of Intrusion Detection Systems

Although much has been done, the VA's Office of Cyber and Information Security (OCIS) still needs to validate whether VA completed installation of Intrusion Detection Systems (IDS) at all sites. Deploying and installing IDS is a key step in the process of securing VA data systems on a national basis. Implementation of IDS increases VA's ability to detect intrusions. OCIS advised us that an enterprise-wide IDS has been fully implemented. In addition, OCIS is researching the benefits of moving to Intrusion Prevention Systems in an effort to provide VA the capability to detect and prevent "attacks."

7. Infrastructure Protection Actions

VA needs to complete infrastructure planning efforts. During our FY 2004 audit, we found examples where the physical infrastructure had significant vulnerabilities and did not adequately protect data from potential destruction, manipulation, and inappropriate disclosure. During our FY 2005 field work, we found that VA was developing a Critical Infrastructure Protection Plan, and completed an identification and prioritization of critical information resources.

8. Information Technology Centers' Continuity of Operations Plans

VA is making progress and had completed Continuity of Operations (COOP) plans but full testing needs to be done. VA has issued an Emergency Preparedness Directive/Handbook 0320 for the VACO COOP. VA was developing a Master COOP for the entire VA, which will include all elements in the Central Office COOP. NIST 800-34, "Contingency Planning Guide for Information Technology Systems," dated June 2002 recommends COOP testing should be accomplished at least annually. COOPs covering Information technology Centers (ITCs) need to ensure capabilities exist to provide necessary operational support in the event of disasters. Our field tests conducted in FY 2005 showed that the ITCs have completed these contingency plans, but that testing these plans needed to be jointly done among all program offices residing in the ITCs. After FY 2005 field work was completed, we learned that VBA-related hardware had been procured at one ITC to back up data, and some independent testing has been performed. VBA informed us that they recently conducted tests at their ITCs and performed disaster recovery exercises. While this is a step forward, joint testing by all covered ITC offices is needed.

9. Certification and Accreditation Process

During FY 2005 field work, we found that VA had placed a priority on the uncompleted Certification and Accreditation (C&A) process. The number of VA systems and major applications decreased from 678 in FY 2004 to 585 in FY 2005, as a result of VA combining applications or by removing previously reported systems that did not meet the NIST criteria. At the end of our field work in the summer of 2005, VA had not completed a C&A for all systems and major applications. The Secretary had made it a priority to complete all C&A work by the end of August 2005, and in November 2005, VA reported to the Office of Management and Budget that it had completed a C&A for all VA systems and major applications.

10. Terminate/Upgrade External Connections

In prior audits, we reported security risks associated with the operation of uncertified Internet gateways. As of FY 2005, VA took actions to mitigate these risks by limiting the number of Internet gateways in order to improve control over access to VA systems. Field work conducted in FY 2005 found that VA is still unable to determine if all extraneous external connections have been terminated. We are currently unsure of the

extent VA and its affiliated and non-affiliated partners may be operating their own gateways. We also found that the standard contract VA used to procure computers included modem devices as a standard feature, which if retained in default settings could serve as access points for hackers attempting to gain entry into VA systems. A January 11, 2005, OIG report on procurement of desktop modems prompted VA to amend its contract and to address the modem security vulnerabilities with all facilities.

11. Configuration Management

Prior year audits have found instances where VA networks relied on old operating systems such as Windows 95 and Windows 98, which placed the VA networks at risk due to the lack of vendor support to upgrade security and other features. An unsupported operating system, whether desktop or production mainframe, exposes VA to potential security and operational risks, including operating system failure. During FY 2005 field work, we found VA had reduced the number of personal computers running Windows 95, but other aged computers must continue to operate due to special document scanners associated with The Imaging Management System. We were told that these scanners and personal computers are expected to be replaced or retired during FY 2006, if funds are available. Additionally, OCIS confirmed VHA has not completed the conversion of 162 older operating systems. In order to mitigate the risks associated with the older operating systems, VHA moved the devices to a virtual local area network configuration with restricted access.

12. Movement and Consolidation of VACO's Data Center

We previously reported that the VACO data center was located below ground level and experienced water damage twice in the last 10 years. VA reported the relocation of the VACO data center is in progress. In the interim, VA placed equipment in multiple locations throughout the Washington, D.C., metropolitan area until procurement and construction is completed at a new location. Even though progress has been made, we identified routers and switches that support VACO network operations that remain below ground level.

13. Application Program/Operating System Change Controls

VA change control policy does not provide uniform application development and change guidance for a wide range of new and legacy applications. Nationwide policy is necessary to facilitate consistent implementation and effective monitoring of system change controls for mission critical systems. For example, we found changes to a mainframe operating system and supporting hardware were not supported by local management authorization. Additionally, we found instances where changes to the production environment were not adequately documented or approved for major applications and critical systems. Consequently, unauthorized changes could have adversely affected the production environment or lead to misuse without warning.

14. Physical Access Controls

At previous sites visited, VA was attempting to make improvements to ensure adequate measures were implemented to secure veterans' information and provide a safe environment for employees and visitors. However, our facility reviews at new locations showed physical access controls still need improvement. For example, a number of facilities granted access to computer rooms to employees who did not have a need to be in the computer room to perform their job function, and some contractors did not have an escort while in the computer room.

15. Wireless Security

VA is making progress in reducing wireless security vulnerabilities by securing its network from outside intrusion. Actions were taken to install an encryption wireless product that is designed to prohibit unauthorized users from accessing the network. However, our penetration test showed some vulnerability in the wireless network could be used to view transmissions, including those containing patient data, and to gain access to systems residing on VA's internal networks. Despite improvements, VA's information systems remained at risk for unauthorized access or misuse of sensitive information.

16. Encrypting Sensitive Information on VA Networks

VA has stated that it was taking interim steps to improve transmission of protected and sensitive information over its networks as sensitive data continues to be transmitted in clear text on VA networks. VA informed us that installation of encryption capabilities on some of its older platforms would render the systems inefficient. VA was looking for solutions to establish controls to secure electronic protected health information. Field tests conducted in FY 2005 continued to demonstrate the need to improve controls as our contractor's penetration test showed an intruder could successfully view protected health information in unencrypted clear text from outside a VA network. Site work also showed examples where unencrypted protected health information was vulnerable at other VHA facilities. The CIO informed us that a Transmission of Privacy Information in Clear Text work group was established to determine: (1) classes of data within the VA, (2) sensitivity ratings for these data classes, (3) strategies for implementing controls for the protection of these data classes, and (4) the most efficient and effective way to protect the privacy of veteran information electronically transmitted across the network.

17. FISMA Reporting Database

FISMA establishes security requirements and requires VA to annually report vulnerabilities for systems and major applications. While VA is taking actions to address security vulnerabilities, we continue to identify weaknesses that require a centralized and coordinated effort to ensure corrective actions are taken to control access, to secure computer rooms, and to ensure facilities accurately report their security deficiencies that place VA information and data at risk. The FISMA database

contains the self-assessment surveys of VA's major applications and systems. System and application deficiencies, as well as funded and unfunded remediation plans, are reported and stored in this database. Consequently, this database needs to accurately demonstrate the security posture of VA's systems and major applications. Also, it should accurately depict the risk of loss of the critical and sensitive information contained within these systems and major applications.

Comparisons of the sites visited to the entries in the FISMA database found that not all information was accurate or complete. Most inaccuracies involved reporting of the five levels of IT security program effectiveness outlined in the Federal Information Technology Security Assessment Framework. Additionally, we found no evidence that facilities were held accountable for information inaccuracies or incomplete data in the database. For example, fields requiring information pertaining to the amount of funding needed to correct deficiencies were incomplete. Areas needing clarification included physical security controls, risk assessments performed and documented as required, password controls, personnel sensitivity designations, and personnel background investigations. VA senior leadership needs this information to determine the costs to correct the conditions identified. With inaccurate or incomplete information in the FISMA database, VA senior leadership will not have a complete picture of VA's information security posture and the level of resources and funding needed to remediate security deficiencies.

VA is currently developing policies and procedures for implementing a federated approach to managing IT security and resources, and is still in the process of addressing recommendations made during prior FISMA audits. VA has made progress during FY 2005 to improve IT controls and to implement some recommendations. For example, after the FY 2005 testing was completed, VA informed us that certification and accreditation reviews have been completed and the deployment of IDS has been accomplished. We will validate implementation in future annual FISMA audits. We have not made recommendations in reference to these issues because VA will comment on them in the most recent FISMA report.

### Combined Assessment Program (CAP) Reviews Show Information System Security Vulnerabilities Continue to Exist

We continue to identify instances where out-based employees send veterans' medical information to the VA regional office via unencrypted e-mail; system access for separated employees is not terminated; monitoring remote network access and usage does not routinely occur; and off duty users' access to VA computer systems and sensitive information is not restricted. We continue to make recommendations to improve security and contingency plans, control access to information systems, complete background investigations and annual security awareness training, and improve physical security controls.

While individual and regional managers have concurred with these CAP recommendations, and our follow-up process confirms actions to resolve the specific

conditions identified at these sites, we continue to find that corrective actions are not applied to all facilities to correct conditions nationwide. As a result, we continue to find these systemic conditions at other sites we visit. For example,

- At a VA Healthcare System, we found that computer access privileges were not promptly terminated or modified when users separated from the facility. IT contingency plans did not include all critical elements to ensure continuity of operations during a disaster or emergency, and annual IT security awareness training was not completed by all active users.

- At a VARO, we identified the need for managers to ensure that Benefits Delivery Network commands requested were necessary and that employees' claims folders were electronically locked. As employees' duties change, the allowed commands and the need for new BDN access commands needs to be evaluated. Testing found that 7 of the 20 access commands authorized permitted employees the rights to use more data files than was needed to perform their current assignments.

Between FYs 2000 and 2005, the CAP program identified IT and security deficiencies in 141 (78 percent) of 181 VHA facilities reviewed. We identified IT and security deficiencies at 37 (67 percent) of 55 VBA facilities reviewed. These reviews add further support to our conclusion that VA needs a centralized approach to standardize operations and address systemic issues nationwide.

## Conclusion

Our CFS audits, FISMA audits, and individual CAP reports of VA medical facilities and regional offices all highlight specific vulnerabilities that can be exploited, but the recurring themes in these reports are the need for a centralized approach to achieve standardization in VA, remediation of identified weaknesses, and accountability in VA information security. Specific recommendations were not made in this section because, while the 17 recommendations remain unimplemented, they are listed in previously issued OIG reports. We will continue to follow up on these recommendations until fully implemented.

Appendix A

# Secretary's Comments



**THE SECRETARY OF VETERANS AFFAIRS**
**WASHINGTON**

July 6, 2006

The Honorable George J. Opfer
Inspector General
Department of Veterans Affairs
Washington, DC 20420

Dear Mr. Opfer:

Thank you for the opportunity to review and respond to the report on events related to the Department of Veterans Affairs' (VA) data loss. I fully concur with the recommendations contained in the report.

The tragic event that was the impetus for the report exposed deficiencies in information security involving leadership, policies and procedures. That will change during my tenure as Secretary of Veterans Affairs. On June 28, 2006, I signed a memorandum delegating to the VA Chief Information Officer (CIO) all authority and responsibilities given to me by the Federal Information Security Management Act (FISMA). This delegation restructures responsibilities and authorities for information security here at the VA and initiates the needed cultural changes that must occur. I have made it clear to all senior managers in the Department that information security, cyber security and the reorganization of the Office of Information Technology (OIT) are my top priorities going forward.

I have promised our veterans and employees that VA will become a Gold Standard and recognized leader in security of personal information. I will settle for nothing less. To accomplish this ambitious goal we must work diligently to establish a culture that embraces these standards. We will not stop until we have accomplished our objective of leading the federal government in information and cyber security policies and procedures, just as we accomplished the monumental change in our health care system over the past decade. VA is the leader in patient safety and quality of care, and we can become the leader in information security.