CONGRESSIONAL TRANSCRIPTS
Congressional Hearings
June 29, 2006

# House Veterans' Affairs Committee holds Hearing on VA Data Security Breach

**LIST OF SPEAKERS**

---

NICHOLSON:
   Good morning, everyone.
   I just want to make a statement here before we get started to announced that (inaudible) it has just been confirmed to me by the...

BUYER:
   Mr. Secretary, are you holding a press conference in here? Are you starting having a -- the hearing hasn't started yet.

NICHOLSON:
   ... the attorney general of the United States that the subject hard drive laptop computer that was stolen from an V.A. employee's home has been recovered. It's confirmed that that has been recovered.
   The investigation continues to see whether or not this information has been compromised in any way or copied. There is reason, however, to be optimistic.
   I want to thank the law enforcement community that's been involved in this. They've done a terrific job of collaboration between our own inspector general at the V.A., the local police and the Federal Bureau of Investigation.
   So it's a very positive note in this very tragic, epic event.

(UNKNOWN)
   Mr. Secretary, does this let you off the hook, do you think?
   Mr. Secretary, does this let you off the hook?
   (CROSSTALK)

(UNKNOWN)
   He started a press conference in our hearing room, so I can ask him questions. He acts as if he recovered the stolen data.

(UNKNOWN)
   But in all fairness...

(UNKNOWN)
   No.

(UNKNOWN)
   Let's let the chairman decide. Let's let the chairman decide.

(UNKNOWN)
The secretary wants to make a statement to the press before we begin here. (OFF-MIKE)

BUYER:
The House Committee of the Veterans' Affairs Committee will come to order, June 29th, 2006.
This morning we will continue our examination of the data theft and information security at the Department of Veterans Affairs. The catalyst of this examination was the compromise in May of data belonging to as many as over 26 million veterans, 2.2 million servicemembers and some family members.
The purpose of our oversight has focused on obtaining as much of the understanding as possible. It has included a business roundtable with information and experts. We've had seven hearings, including two subcommittee hearings.
This is nothing less than a full examination of the information management systems of the Department of Veterans Affairs. What we learn here will inform us of our efforts to make whole any veteran harmed by the theft of personal information and assure the security of veterans' personal information.
Over the past month, this committee has brought in over 17 witnesses to examine the loss of data, the current structure of informational security as an extension of the structure of information technology, and options regarding credit monitoring and information security.
Witnesses have included Secretary Nicholson, the V.A.'s inspector general, general counsel. Experts from the GAO, academic, and experts from the field of data security, information technology management and identity theft have testified.
Additionally, the Subcommittee on Disability Assistance and Memorial Affairs held a joint hearing with the Subcommittee on Economic Opportunity on June 20th to review data security in the Veterans Benefits Administration.
The Subcommittee on Health held a hearing on June 21st to review the security on medical information in the Veterans Health Administration.
Today's hearing is a capstone of that.
Mr. Secretary, I want to thank you for being here this morning. We look forward to hearing what steps the department has taken to mitigate the second-largest breach of personal data in American history and how we're going to help our veterans.
We are interested in learning, as well, what the V.A. is doing to prevent future security breaches, what plans exist to mitigate the event of identity theft as a result of this breach or any other breach. We look forward to receiving your testimony, Mr. Secretary.
In fairness to you, I offer a brief overview of what we have learned from these hearings, not to mention several years of painful experience in dealing with these issues and the V.A.'s bureaucracy.
Almost without exception, experts from academic and leading businesses have told this committee that the complexities and threats characterizing information management today require the system to be centralized. They further state that the V.A.'s decentralized I.T. structure make it, quote, "practically impossible," end quote, to secure its data.

Time and again we have heard the same counsel: limit the number of data users; minimize the amount of data that must be exported for use; screen and train your people; and centralize the system and empower the chief information officer.

While no one knows whether this compromise of data will produce cases of fraud, executives who have successfully recovered from large- scale data compromises have informed this committee that fast action is required. Communications with your customers is important when time is of the essence. Offer mitigating services quickly; coordinate with law enforcement agencies quickly.

But the word "quick" does not seem to characterize anything about the V.A.'s response to this threat. Over the years, the GAO and the department's own I.G. have testified on these issues repeatedly, since 1997. They brought grave security deficiencies and vulnerabilities to the attention of V.A. officials, who in turn essentially have ignored them.

Two immediate former department CIOs and a former associate deputy assistant secretary for cyber and information security informed this committee of impenetrable barriers thrown up by a turf-bound culture of the status quo that affects your middle and senior ranks of leadership.

The department's general counsel of 2004, I believe gave the narrowest possible interpretation of your predecessor's decision of his efforts to centralize I.T. authorities and empower the CIO.

Mr. Secretary, from this vantage point, I believe that at times you have not been well-served. You have inherited an unfortunate situation, and you're a military man yourself. I commend you on the acceptance of responsibility for a sorry state of affairs, but you are attempting to cut through the cultural resistance and fix it.

I read the memo that you issued last night, and I congratulate you for that memo. I can almost envision the spirited debate that occurred at the table before you signed that memo.

So I'd like to thank you for that.

In your opening statement, I would also, though, like for you to inform this committee of any other data breaches that you have knowledge of, or in particular the data loss in Minneapolis.

And I am distressed to have heard about the lost tape in Indianapolis, because your counsel was just this week before this committee, yet never informed this committee that you have a missing tape that contains over 16,538 legal cases.

So I am pre-stressed this morning, to have learned this last night, very late.

At this point, I'm going to yield to Mr. Filner for any opening statements he may have.

FILNER:

Thank you, Mr. Chairman.

And I, again, as I have in the preceding five hearings, thank you for this real example of oversight that the committee should be following.

Mr. Secretary, we are, I think, grateful about the announcement that you just made this morning. It lifts a heavy burden from the hearts of millions of veterans if it's true that there was no compromise.

We congratulate law enforcement, and we can all breathe easier.

I think everybody here is very grateful.

But it doesn't change some fundamental things, Mr. Secretary. You start off with a little stunt. You never told us that the data had been recovered. Typical for this last two months, you've been spinning, spinning, spinning; you've been doing P.R.; and you've done very little to deal with the issue that the veterans face with fear every day.

It doesn't change the culture that we have had to find very clearly in these hearings and which Mr. Buyer has been talking about for seven years now.

It doesn't change the lapses in your personnel chain that has kept information apparently from you, from the FBI, from us.

It doesn't change the fact that your intentions seem to be to have blamed all of this on one guy who, as we will introduce today at the hearing, had permission to take his laptop, had permission to download the data, had help to download the data, had authorization to use that data, had taken every step.

And yet, he's been accused -- as far as I know, the only one in your whole operation that any operation has been taken against in a personnel way. He's been accused, as I understand, of gross negligence. He did everything he was supposed to do. He informed the cops in 52 minutes. Your guys didn't inform you for six or seven days. Who was grossly negligent there?

So Mr. Secretary, we've got a lot to do. This memo that Mr. Buyer referred to is a good step, I take it. And I agree with you on that, because it's something you've been working for many years, and I know you feel some satisfaction in that. And this theft, which hopefully is not a compromise now, was the stimulus to take action on something that we all should have recognized the chairman's incisiveness on this, for many years.

So we still must act -- we still must act on that centralization; we still must act on the culture; we still must figure out why you decided to fire one person in this whole mess, and whether he was actually grossly negligent or other people were.

Mr. Chairman, I ask for my full statement to be made a part of the record.

BUYER:

Hearing no objections, so ordered.
If any other members have opening statements, you may submit them for the record.
If you would like -- I'll yield to the gentleman.

STEARNS:

Mr. Chairman, I just want to commend the secretary for his announcement this morning. I think it's breathtaking that he found the computer, and I commend he and his staff for doing it.

(UNKNOWN)

I don't think he found it.

STEARNS:

Well, at any rate, his announcement that at this point they have the computer. And I think all of us are just waiting to hear more what's happened. And I think perhaps the angels are on his side at this point, so I look forward to his comments.

(UNKNOWN)

Mr. Chairman, I'm not going to make a statement, but I was not here. And when I walked in, so I hope that the secretary will begin anew, so I know exactly what Mr. Stearns is commending him for.

Thank you.

BUYER:

We're going to give the secretary great latitude. And we have invited him to come back, after we have also done our due diligence in our investigations. And if you recall, we had him here immediately after this happened, but also the Senate wanted him, so we only had him for about an hour.

So we're going to have the secretary here for as long as it takes this morning. And he has his undersecretaries are here.

And Mr. Secretary, you are recognized.

NICHOLSON:

Thank you, Mr. Chairman and members of the committee.

Coming in here, I was asked if I would make a brief statement to the press, because of the news that we have, the good news.

And so I will start just by repeating that, by saying that it was confirmed to me by the deputy attorney general just right before coming up here that they have, indeed, in their -- law enforcement has in their possession the subject laptop and hard drive. The serial numbers match.

They are diligently conducting forensic analysis on it to see if they can tell whether it's been duplicated or utilized or entered in any way, and that work it not complete.

However, they did say to me that there is reason to be optimistic about that, but that is not a certainty.

I would like to again -- I appreciate your kind words, Mr. Congressman. The only part I had in this recovery were my prayers to St. Anthony, I'll tell you.

But the law enforcement community did a very, very good job in this. And to have gotten their hands on these two small items in the volume that there is circulating out there in that world is really extraordinary. And I'm very grateful, and I know you are.

We'll just have to remain hopeful that they haven't been compromised. And as I said, there is reason to be optimistic.

BUYER:

And are they looking -- they're doing the study, the forensics, right now?

NICHOLSON:

As we speak, yes, sir.

BUYER:

All right, thank you.

NICHOLSON:

Again, I would like to thank you all for the opportunity to appear here today to follow up on what has occurred at our department. And my testimony, my opening statement will be in the context of this big problem, because I agree with Filner in many respects.

This has brought to the light of day some real deficiencies in our department in the manner in which we've handled personal data and cyber-information. And if there's a redeeming part of this, and I believe there is, it is that we can really turn this place around. And I sincerely think we can make it into the gold standard for information security, like we have the gold standard for electronic health records. And that is our challenge -- indeed, that's our mandate.

But I will testify in the context that things are, as we thought they were last night or yesterday at this time.

So again, this theft occurred on May 3rd, and it's been tragic on many levels. But I also -- and this may now be moot -- but there was a perception on the part of many members of the public that the data was lost to the V.A. It was never lost. These were copies of that data that were lost.

And I also want to highlight the fact to you, the members of this Oversight Committee, that while we've been addressing this issue, as you would imagine, double time, we also have been attending to the business of the V.A., which is our core mission, which is caring for the health needs and benefits of our veterans and of course the burials.

I would point out to you that we have over a million veterans come to us every week for health care provision, and we're taking darn good care of them.

Since this theft occurred and has come to my attention, I have taken many proactive steps on many fronts. But all of them have been guided by one question -- the answer to one question, which is, what is going to be the best for the veterans?

And this committee and its various subcommittees have had at least one hearing a week since this theft became public, mostly focused on the elements of the theft and its aftermath.

Other committees have held hearings on this, and we've provided briefings for various members of the Congress and their staff.

So for that reason, much of what I say will be familiar to you, I know. But I would like to organize my presentation into a few basic points, and that is, what have we done, what are we doing, what needs to be done, and how will we measure progress on these fronts?

And again our goal is on behalf of the veterans to make the V.A. into a first-rate organization in the realm of cyber and information security, just as we've done as an integrated health care provider.

Following the theft of this data at the employee's home, we determined or attempted to determine the scope of the loss. And we retained forensic experts.

And once the magnitude of this was more fully understood, we began working nonstop to see what steps are appropriate now, going forward, to protect our veterans.

NICHOLSON:

I directed a series of personnel changes in the Office of Policy and Planning, where the breach occurred -- the two senior people in that department, as well as the person who had custodial responsibility for this data.

I retained an outside independent adviser to me, Rick Romley, the former prosecutor and district attorney in Arizona. I have expedited cyber-security awareness training and

privacy training for all V.A. employees -- directed that V.A. facilities across the country observe Security Awareness Week this week. And it's focusing on ensuring that security is an integral part of our workplace culture, ethic.

The V.A.'s initial response to this loss was to create a call center with the capacity to handle 260,000 calls, and we've reprogrammed $25 million to do that. To date, we have spent $9.3 million in that call center, and we've had a total of 212,000 calls.

Another thing that we did is we did a mailing to all of the 17.5 million people for whom we had addresses by matching our data with the IRS to come up with those addresses. That mailing costs $7 million.

As you well know, we also requested and got the requisite policy approvals to seek from you the ability to provide security monitoring for the affected veterans, servicemembers and family members. And I have quite a bit on that, and I think that I will demure on that pending what questions that you might have on that. You know, we hope and pray that that's academic, but we don't know that as I sit here.

Let me talk about some specific actions that are going to -- that are and will occur at the V.A. And, again, one of the redemptive parts of this, I think, is the absolute wake-up call, lightning rod, to make changes in this organization, some of which I hope will become models for other agencies that I know have some similar complacency and laxity that we have had on information security.

I've directed that every laptop computer in the V.A. undergo a security review to ensure that all security and virus software is current, including the immediate removal of any unauthorized information or software, and the application of appropriate encryption programs. But because of the pending lawsuits, this directive has been placed on hold until we obtain further guidance from the courts.

In addition, we have been in discussions with corporations which provide unique data breach analysis to see if the data has been exploited. And we anticipate that we will enter into a contract for that service shortly. And I would add here parenthetically that I think we should do that anyway, regardless of what the outcome of what we are now hoping for, based on today's news is.

This is not extremely expensive. It's a new technology. But they can tell you whether a body of data is being used -- exploited by people who do this, who steal identity and exploit it.

We're making an effort to be responsive to the concerns of you, Mr. Chairman, and this committee by directing us to provide detection, protection and insurance (ph), and that, I would say, is there. It's pending further information.

I've directed that the V.A. conduct an inventory of all positions requiring access to sensitive V.A. data to ensure that only those employees who need such access to do their jobs have it, and that they have the appropriate background checks.

And if you could think of a model for this -- it's one that you're all familiar with -- which is the -- having a security clearance for having access to classified information and having a need to know the information. This, unfortunately, has just not been the standard in our organization.

And as you've heard me say before, the person who had custody of this data had not had a background check in 32 years -- as an example.

We have been, in an effort to conduct this inventory of these positions -- and then we are working on a program for getting these background checks in place, which is no small task given the time delays there are in those, and it's costly.

We're doing a major I.T. reorganization within the V.A. And it's true, as the chairman and the ranking member have said, that the V.A. has been very highly decentralized -- and this is a huge organization that's spread all over the world, really, from Togos (ph), Maine, to Manila in the Philippines.

And some of that decentralization has been good. It's kept the I.T. closer to the ultimate user. And I would say that it's also been very, very valuable and important in the development of the highly vaulted (ph) electronic medical records that we have that lead -- I was at the World Forum of the American Enterprise Institute recently where they were universally praising the V.A. for what it's been able to accomplish in this front.

But it's also -- this decentralization has also led to a system that is very, very complex, frequently incompatible and very difficult to manage. And that's become clear to me, and it did shortly after I came into this job 16 months ago.

So after reviewing the recommendations of a consultant who had been studying the I.T. situation at the V.A. after the ill-fated CoreFLS endeavor in Florida in October of '05 -- or that's when it -- that's when I made the decision and signed a memorandum directing the reorganization of the I.T. within the V.A. That was last October.

And pursuant to that, now more than 4,600 I.T. professionals engaged in operations and maintenance of the department's I.T. infrastructure, plus 560 unencumbered positions have been detailed to the Office of Information and Technology under the direction of the chief information officer.

As of the beginning of the new fiscal year coming up, on October 1, those who have been detailed will become permanently there, establishing thereby a new career field within OIT, giving collective bargaining agreements with...

(CROSSTALK)

ACTING CHAIRMAN:
Excuse me. Excuse me, Mr. Secretary...

NICHOLSON:
... the terms and conditions.

ACTING CHAIRMAN:
Mr. Secretary, if you could hold your spot. Put a little note there in your statement -- hold that spot. I've been informed we have three votes. And we have a 15-minute vote on the Poe amendment, a two-minute vote on Hefley, and then a final passage.

So we're going to stand in recess for approximately 25 minutes.

And, Mr. Secretary, given your announcement, I'm sure that you're going to be asked questions from the press. You have the permission of the committee to speak with the press and to conduct an interview in this room.

The committee stands in recess.

(RECESS)